BERNARD COMERESKI, Respondent, *v.* CITY OF ELMIRA et al., Appellants.

Third Department, March 24, 1954.

*Harry Moseson* for City of Elmira Parking Authority, appellant.

*George H. Winner, Corporation Counsel,* for City of Elmira and another, appellants.

*L. II. Teeter* for respondent.

IMRIE, J.  Plaintiff brought this taxpayer's action for judgment voiding an agreement of May 8, 1950, between defendants, City of Elmira and the City of Elmira Parking Authority (hereinafter referred to as the Authority), and for incidental injunctive relief.  Defendants moved at Special Term for the dismissal of the complaint as failing to state facts sufficient to constitute a cause of action.  This appeal is from the order denying that motion.

The Authority was created as a public benefit corporation '' for the benefit of the people of the city of Elmira and its environs,'' (Public Authorities Law, § 1495), and as being a public purpose, by chapter 637 of the Laws of 1948, amending the Public Authorities Law by the addition of title 9 to article 7 thereof.  It is to continue for a period of five years only and thereafter until all its liabilities have been met and its bonds paid in full or discharged.  The declared purpose of the Authority is to provide parking areas in Elmira.  At the termination of its existence all of its properties and rights pass to the city. Its stated powers include the acceptance of grants, loans or contributions from the city, *inter alia.*  The city may convey to the Authority, with or without consideration, real or personal property for the latter's use as a project or projects. Bonds or other obligations of the Authority shall not be a debt of the State or of the city.  Neither shall be liable thereon, nor shall the bonds be payable out of any funds other than those of the Authority (Public Authorities Law, § 1493).

Implementing the statute, section 73 of the Elmira City Charter was amended by Elmira Local Law No. 5 of 1949.  The amendment permits the council to adopt a resolution to authorize a contract between the city and the Authority, pledging all or any part of the net revenues received or to be received from the city's street parking meters, such pledge to extend as long as the bonds of the Authority remain outstanding, but in no event for a period longer than thirty years from the date of the execution of the contract.

The contract in question was executed following action by the Authority providing for the issuance of its bonds in the

amount of $500,000. This action particularly challenges the legality of two features of the contract. The first is the agreement that the city pay to the Authority the amount of the estimated deficit, if any, in the latter's operation and maintenance fund and debt service fund, not exceeding $25,000 in any calendar year, such payments to be made exclusively from the '' net revenues of City parking meters '' as thereinafter defined. The pledge of net returns is limited to existing meters, but not meters later installed except as substitutes. The second controversial item of the contract is the city's promise that it will not substantially reduce the number of parking meters used on the streets of the city during the existence of the agreement, with the qualification that it '' shall not be construed to prevent the City from abandoning or changing the sites of existing parking meters, it being the intention of this paragraph that the source of revenues from parking meters by the City is not to be decreased to a point below the City's pledge during the life of this agreement.''

The pledge and agreement to pay net parking meter revenues are said to be such a gift or loan of the city's credit as to violate constitutional and other prohibitions, meaning section 1 of article VIII of the State Constitution and the limitations of sections 1492 and 1493 of the Authority Act.

While the designated section of the Constitution provides that a city may not give or loan its credit to or in aid of any individual, or public or private corporation or association, or private undertaking, the earlier portion of the same section does not include *public corporations* among those to whom *a gift or loan of a city's money or property* is banned. '' There is here a clear distinction in the scope of the restriction, placed by the Constitution upon a unit of local government in the administration of its finances, between a gift or loan of the *money* or *property* of such a unit and a gift or loan of its *credit*. Public moneys should be used for public purposes; therefore, gifts or loans of public money or property may not be made to an individual or *private* corporation or association or private undertaking, but there is no prohibition against gifts of moneys to a *public* corporation for a public purpose, at least where the local unit does not borrow the money so given or loaned. Unwise use of local public moneys even for a public purpose may cause hardship to the taxpayer but correction of error there is left by the Constitution to the people whose money is used and who select the local officials. The entire machinery of local govern-

ment may, however, break down if the credit of the units of local government required to carry out their governmental functions is impaired, and there may be danger of such impairment if a local unit is permitted to give or loan its credit or to borrow money in aid of undertakings outside of its own field. To safeguard that credit the Constitution permits the use of its credit by a local unit only for the purposes of that unit, and prohibits it from giving or loaning its *credit* to or in aid of any ' *public or private* corporation.' '' (*Union Free School Dist.* v. *Town of Rye,* 280 N. Y. 469, 474; emphasis as in quoted opinion.)

The promised payments depend upon two contingencies: the existence of deficits in the Authority's funds already mentioned and the existence of net revenues from the city's parking meters. Clearly the Constitution does not prohibit such gifts, nor are such gifts prohibited by sections 1492 and 1493. Granted, the statute does not explicitly authorize or direct the city to make payments to the Authority, but it is implicit with the assumption that payments will be made. Subdivision 12 of section 1485 empowers the Authority to '' accept grants, loans or contributions from * * * the city * * * and to expend the proceeds for any purposes of the authority.'' Subdivision 3 of section 1487, concerning contracts between the city and the Authority, states, '' and the payments required [by the contract] to be made by the city may be made and financed notwithstanding that no provision therefor shall have first been made in the capital budget of the city.'' Incidentally, that subdivision also permits such contracts to be pledged by the Authority to secure its bonds.

In the event of such payments, the bonds remain no less the bonds of the Authority and become no more the bonds or obligation of the city because of such promise. When and if the city makes the payments, the title to the money thus transferred passes to the Authority (§ 1487, subd. 1) and any payment then made on account of debt service fund will be from the funds of that board as required by section 1493. The pledge of meter revenues is not a gift or loan of the credit of the city within the purview of the Constitution. It does not contravene the Constitution. It is not contrary to title 9 of article 7 of the Public Authorities Law considered as a whole. It is an incident to a contract made under that act and pursuant to a local law, by means of which the Constitution (art. IX, § 12) allows cities to regulate their property. While it is arguable that the pledge is in the interest of the bondholders, it is abundantly clear that

the city is a direct beneficiary of its own pledge by reason of the assurance to it of clear title to the parking project when the bonds are paid in full.

We do not overlook that the city could have utilized section 72-j of the General Municipal Law to develop off-street parking areas. Instead it chose to accomplish that purpose through the medium of the Authority. If section 72-j had been followed, it is certain that parking meter revenues could have been used to forward a project identical to the one now under way.

Why, then, should it be assumed that the Legislature intended to prohibit the city's doing through the Authority that which it could do directly, if acting in its own name?

The agreement as to the continued existence of street parking meters is not an illegal surrender of the city's governmental function and power. Such meters exist by virtue of a delegated police power for the control of highway traffic. There is no agreement here not to exercise such power but, rather, to continue to exercise a power of traffic regulation which, by reason of the constant increase of automotive traffic, will be no less necessary in any reasonably foreseeable future.

In *State ex rel. Bibb* v. *Chambers* (77 S. E. 2d 297) the Supreme Court of Appeals of West Virginia had under consideration a municipal ordinance relating to the financing of parking lots in the city of Beckley. It was ordained that existing curb-line parking meters would necessarily be continuously maintained and operated throughout the life of the bonds authorized, provided, however, that the representation to such effect would not be construed to prohibit appropriate changes in the location of parking meters made necessary by street widening or street closing, nor to prohibit substitution or changes in their location for necessary traffic regulation and control so long as any such changes or substitutions would not materially lessen the amount of revenues derived from such parking meters. The court, citing *Poole* v. *City of Kankakee* (406 Ill. 521), held that the ordinance was not a surrender of the police power delegated to the municipalities of the State. In the *Poole* case the Supreme Court of Illinois held that such an agreement was not a surrender of the city's police power, remarking (pp. 535–536): " It is apparent that the city has reserved unto itself a wide discretion in the matter of location, regulation and control, and that, while it has pledged itself to fix and collect reasonable fees and charges, it has not bound itself to fix any specific unalterable amount of fee or charge."

No sound reasoning has been advanced to demonstrate that Local Law No. 5 of 1949 constitutes an attempt to alter the provisions of the Elmira Parking Authority Act, or attacking or challenging its enactment. Our duty here is to determine whether the acts of the municipality and its officers are permissible under the Constitution and the statute. We hold that they are. We may properly take judicial recognition of the problems facing all cities by reason of the ever-increasing traffic congestion. Unless there is a clear and convincing violation of constitional and statutory prohibitions or requirements, we should indulge every intendment of legality in favor of legislative and local enactments stated to be and so definitely in the public interest.

The order should be reversed and the complaint dismissed, with costs to be divided between the City of Elmira and the Elmira Parking Authority.

FOSTER, P. J., BERGAN, COON and HALPERN, JJ., concur.

Order reversed, and the complaint dismissed, with costs to be divided between the City of Elmira and the Elmira Parking Authority.