[Civ. No. 5163.   Fourth Dist.   Dec. 16, 1955.]

CITY OF LA MESA et al., Petitioners, v. L. L. FREEMAN, as City Clerk, etc., Respondent.

Leo R. B. Henrikson, City Attorney (La Mesa), Jennings, Engstrand & Henrikson, O'Melveny & Myers, Ray H. Lindman and James W. Beebe for Petitioners.

Luce, Forward, Kunzel & Scripps as amici curiae on behalf of Petitioners.

Donald A. Stewart and F. Joseph Doerr for Respondent.

Vincent Whelan, J. L. Oatman and Herbert C. Kelly as Amici Curiae on behalf of Respondent.

BARNARD, P. J.—   In this mandamus proceeding petitioners seek to compel the respondent city clerk to countersign a warrant in payment of the cost of publication of a resolution of intention in a proceeding for the formation of a parking district under the Parking District Law of 1951. (Sts. & Hy. Code, div. 18, pt. 4.) This warrant was regularly audited, allowed and approved by the city council and the respondent has refused to countersign it on the ground that

the publication of said resolution was unauthorized and illegal and that, therefore, the charge for the publication thereof is illegal. This proceeding was brought by the city and the owner of the newspaper in which the resolution was published. An order to show cause was issued and after a hearing the matter was submitted on a demurrer to the petition, briefs having been filed, with additional briefs of amici curiae in support of the respective parties.

The question presented, as stated by both parties, is: May cities in California, acting pursuant to section 18¼ of article XI of our Constitution and pursuant to the Parking District Law of 1951, make a binding agreement that it will, for a specified period of time, maintain parking meters on specified streets within the city, the net revenues from which are pledged to the payment of principal and interest on bonds issued to provide off-street parking facilities?

The respondent admits that such an agreement is expressly authorized by the terms of the 1951 Act; that in the La Mesa proceeding the provisions of the 1951 Act have been strictly complied with; and that if the warrant was legally issued and is valid his duty to countersign it is mandatory. It is contended by and on behalf of the respondent, however, that an agreement to maintain meters on specified streets constitutes an illegal surrender of the city's police power; that section 18¼ of article XI of the Constitution does not, expressly or by implication, authorize this type of agreement; and that the provisions of the 1951 Act do not sufficiently preserve to the city the essential elements of its police powers. While it is conceded that section 18¼ authorizes the pledging of street meter revenues for the purpose in question, it is argued that this constitutional provision does not authorize an agreement to maintain such meters on specified streets; that authority to agree to maintain meters somewhere in the city is an entirely different thing from authorizing an agreement to maintain meters on specified streets, as contemplated by the 1951 Act; that an agreement to maintain meters on specified streets would constitute a surrender of police power which is illegal and prohibited by sections 11 and 13 of article XI of the state Constitution; and that section 18¼ neither expressly nor by implication authorizes an agreement to maintain such meters on specified streets. In support of the argument with respect to the illegal surrender of police power several cases, including *Sammons* v. *City of Beaufort*,

225 S.C. 490 [83 S.E.2d 153]; *Brodhead* v. *City & County of Denver,* 126 Colo. 119 [247 P.2d 140]; and *Britt* v. *City of Wilmington,* 236 N.C. 589 [73 S.E.2d 289] are relied on.

The petitioners contend that the majority rule in other jurisdictions upholds the validity of an agreement to maintain parking meters on specified streets, even in the absence of a constitutional provision authorizing the same; that in any event section 18¼ authorizes the type of agreement here involved; and that the provisions of the 1951 Act sufficiently preserve to the city the essential elements of its police power. In support of the first of these contentions they rely on *Town of Graham* v. *Karpark Corp.* (4th Cir.), 194 F.2d 616; *Harper* v. *City of Wichita Falls,* (Tex.Civ. App.) 105 S.W.2d 743; *Comereski* v. *City of Elmira,* 283 App. Div. 556 [128 N.Y.S.2d 913]; *State ex rel. Bibb* v. *Chambers,* 138 W.Va. 701 [77 S.E.2d 297]; *People* v. *City of Kankakee,* 406 Ill. 521 [94 N.E.2d 416]; and *Parr* v. *Ladd,* 323 Mich. 592 [36 N.W.2d 157]. It is further argued that section 18¼ not only authorizes the pledging of such revenues as those here in question, as security for bonds to be issued, but clearly was intended to authorize an agreement by the issuer of the bonds to keep in being the facility producing such revenue; that this intention and purpose not only appears from the language used, but is confirmed by the argument in favor of the adoption of section 18¼ which was furnished the voters when that amendment was submitted to the electors in 1950; that the language of the constitutional amendment permits the application of the pledge and agreement to a restricted group of streets; that the covenent in question, with the reservations provided in the statute, does not constitute an illegal surrender of the city's police power; and that while such an agreement does restrict to some extent the freedom the city would otherwise have in exercising its police power, any such restriction is authorized by the constitutional amendment, is one imposed by the state which gave the city its police power in the first place, and is merely a part of the price the city must pay if it wishes to engage in the type of financing authorized by section 18¼.

Without analyzing the various cases from other jurisdictions which are cited, it may be observed that none of those cases cover the exact situation here involved. Not only was there no constitutional provision similar to our section 18¼ of article XI involved in any of those cases, but there are

factual differences between some of those cases and between any of them and the situation with which we are here concerned. However, the reasoning of many of those cases is persuasive in view of the purpose of our statute and the practical situation which it was designed to meet. The majority of those cases tend to support, in principle, the validity of such an agreement as the one here in question and hold, in effect, that there is no surrender of police power in such a case where reasonable reservations are made permitting a change in the location of meters whenever necessary for traffic regulation. There are some such reservations in our Parking District Act of 1951. Section 35701 provides that any agreement of this nature shall not affect the right of a city under its police power "to control, regulate, or prohibit the parking of vehicles on any public way, or portion thereof, to the extent necessary to protect the public safety." Section 35700 provides a similar reservation with respect to maintaining parking meters on any street which has become a "freeway" or "state highway," and under certain other conditions. The most important element of police power in connection with traffic control, the matter of public safety, is thus preserved. The right to act with respect to the public welfare is exercised, rather than surrendered, by providing for additional facilities.

In *Poole* v. *City of Kankakee*, 406 Ill. 521 [94 N.E.2d 416], in considering a city ordinance based on the power granted the city by a state parking act, and in passing upon a contention that the city had thereby contracted away to the bondholders its right of police power until such bonds were paid, the court said that "while a city has no authority to bargain away its governmental powers it may voluntarily contract within the authority granted it by the State." In *Comereski* v. *City of Elmira*, 283 App.Div. 556 [128 N.Y.S.2d 913], the court said:

"The agreement as to the continued existence of street parking meters is not an illegal surrender of the city's governmental function and power. Such meters exist by virtue of a delegated police power for the control of highway traffic. There is no agreement here not to exercise such power but, rather, to continue to exercise a power of traffic regulation which, by reason of the constant increase of automotive traffic, will be no less necessary in any reasonably foreseeable future."

The Parking District Law of 1951 provides for the continued maintenance of on-street parking meters on specified streets, and for certain periods of time, when the revenue therefrom is pledged for the payment of the bonds authorized to be issued. By this act the state, from which a city derives its police power to regulate traffic, has defined and limited one way in which the city may continue to exercise one of its powers of traffic regulation. It would seem under general principles that it could well be held that the proposed agreement with the bondholders to maintain meters on specified streets, as authorized by the 1951 Act, would not constitute an illegal surrender by the city of its police power. However, under our view of the constitutional provision directly involved it is unnecessary to so hold at this time.

The need for off-street parking facilities in cities and for providing methods of financing them has long been recognized in this state, and has constantly increased. The Vehicle Parking District Law of 1943 (Sts. & Hy. Code, div. 18, pt. 1) attempted to meet this problem by providing for the formation of parking districts financed by the sale of bonds payable mainly from assessments upon the property benefited. The Parking Law of 1949 (Sts. & Hy. Code, div. 18, pt. 2) provided for such financing by the issue of bonds secured in part by the revenues of on-street parking meters, but on a city-wide basis. This failed to meet a situation which increasingly appears where several shopping areas of a city exist or develop, each with a need for off-street parking facilities which may call for the formation of additional parking districts. Where a city has already pledged to the payment of bonds the revenues from its on-street meters on a city-wide basis, it would naturally be precluded from using the same method for the benefit of other areas. A proposed constitutional amendment was submitted to the voters in 1950, apparently with the intention of meeting this situation, among other things. This amendment was adopted as section 18¼ of article XI of the Constitution. So far as material here, it provides that when a city is authorized to acquire public parking lots and issue bonds, secured in part by the revenue produced by such parking facilities, it "is also authorized to pledge . . . or otherwise make available" as additional security for such bonds "any or all revenues from any or all street parking meters then owned" or to be acquired by the city.

The language of this amendment authorizing the pledging

of any or all revenues from any or all street meters, then owned or to be acquired, clearly authorizes the pledging of such revenue from parking meters on specified streets. It is argued, however, that the amendment does not expressly authorize a covenant to keep such meters on such streets for the life of the bonds. The giving of authority to pledge the revenue from particular parking meters then owned or later acquired, and on specified streets, should be held to necessarily carry with it the authority to agree to keep the meters producing such revenue on the streets for the life of the bonds. (*Easton* v. *Ash,* 18 Cal.2d 530 [116 P.2d 433].)

Moreover, by express language, the amendment also authorizes a city to make any or all such revenue from any or all street meters "available" for the payment of the bonds. The only way a city can make such revenue available for that purpose is by entering into a covenant agreeing to maintain the meters for the life of the bonds. By necessary implication, if not expressly, the constitutional provision thus authorizes an agreement to keep certain meters on specified streets, and to maintain such meters for a specified time.

Whether the authority in question is deemed to be implied or as in effect expressly stated, the only reasonable interpretation of the language of the constitutional amendment is that it authorizes this type of agreement. While the authorization thus given may involve some interference with the exercise of the police power which would other wise exist, this interference results from, and is permitted by, the constitutional provision itself. Being authorized by the Constitution, no unauthorized or illegal surrender of police power appears. That this result was foreseen and contemplated when section 18¼ was adopted is shown by the argument which was submitted to the voters in connection with the amendment at the election in 1950. In that argument it was stated: "[T]he revenue bond buyer must have positive assurance of a source of revenue pledged for this purpose which will be sufficient to pay off the bonds." And also "Parking meters are installed for the purpose of regulating traffic and are authorized as a valid exercise of the police power. Cities cannot contract or bargain away the police power, and yet it will be necessary to execute some long term contracts because parking meter revenue, once pledged, must be assured for a given period of time in order to make possible a marketable revenue bond." In view of the language of the constitutional amendment it must be held that the proceedings here in question are valid, that the warrant was legally issued, and that the provisions

of the 1951 Act sufficiently preserved to the city the essential elements of its police power in connection with its regulation of traffic on its streets.

Let the peremptory writ issue as prayed.

Griffin, J., and Mussell, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied February 8, 1956.