BOARD OF COUNTY COMMISSIONERS OF
HARFORD COUNTY *v.* MacPHAIL

[No. 237, October Term, 1956.]

*Decided June 26, 1957.*

*Motion for rehearing, filed July 26, 1957, denied August 1, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*J. Wilmer Cronin* and *Lawrence B. Fenneman,* with whom were *Robert H. Archer, Jr.,* and *Fenneman, Sachs & Cronin* on the brief, for appellant.

*Michael P. Crocker,* with whom were *Piper & Marbury* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court.

Once upon a time the County Commissioners of Harford County could decide calmly, as an uncomplicated part of their routine duties, what road in the county they would improve,

194

and when and how. That was before the appellee, Larry
S. MacPhail, who had retired as president of the Yankees
baseball club, came down from New York in 1941 and
bought some four hundred acres of farm land in the Third
Election District of the county. Through the farm ran part
of a county public road four miles long, a dirt road, described
as "as bad a road as is possible to find in Harford County",
winding, with bad curves and banks, very muddy, if not im-
passable, in bad weather. From 1941 to the date of these
presents, MacPhail has worked tirelessly getting the county
bindingly to agree to pave the road, and to make it carry out
the agreement. At various times from 1942 to 1951, the
county has paved all of the road but a stretch some eight-
tenths of a mile long, all of it within the MacPhail farm.
When no more work was done after 1951, MacPhail, just
before Christmas in 1954, filed a bill to compel the county to
perform the contract he alleged it had made to grade, base,
align and pave that last unimproved stretch of road. The
chancellor decreed that the County Commissioners "immedi-
ately and forthwith fulfill such obligation", and they have
appealed.

MacPhail says that in 1941 he told the Commissioners he
could use his new farm and the buildings then on it as a
"simple cattle farm" or, if the county would agree to pave
the road, he would make substantial and expensive improve-
ments to carry on a horse and cattle breeding operation and
make the place his home. The Commissioners, he says, then
promised to pave the road. In 1942, MacPhail deeded to the
county the land over which the road actually ran, so as to
correct the deviations from the record right-of-way, and, in
addition, to give the county an extra three feet of width. He
says he delivered the deed, some months after its execution,
only when the Commissioners, in a meeting at the court-
house, gave him in return a definite assurance "that they
would pave the road." Thereafter, the county did some pav-
ing until the scarcity of labor and material during the war
caused an interruption in the work, in which MacPhail, who
himself was in the service, acquiesced.

In 1946, MacPhail renewed his efforts. The Board of

County Commissioners had been reduced by law from five to three. MacPhail says that a holdover member, one Walker, readily acknowledged the obligation of the county to do the paving, as did another member. The Commissioners told MacPhail that the county now must have a forty-foot right-of-way for the length of the road, if it was to do the work, because the law had been changed to require this. MacPhail did not own all of the land abutting the road and induced the owner of the farm adjoining his to execute with him the required deed of option, in the form asked by the county, and then delivered it to the county. In 1948, a mile of road was widened, straightened and paved, and in 1949, about a half mile. Nothing was done in 1950, but in 1951 the stretch improved in 1949 was extended for eight-tenths of a mile. Since then nothing more has been done, and still unpaved and in about the same condition it was in in 1941 is the remaining eight-tenths of a mile.

MacPhail carried out his promise substantially to improve the farm he bought. He added several hundred acres to his holdings, built thirty new buildings, rebuilt or refurbished some twenty existing buildings, built fifteen miles of fencing and a mile and a half of blacktop road, and established a large thoroughbred horse and cattle operation. On the properties, which are known as Glenangus Farms, live some twenty families in which there are thirty children of school age. The annual payroll is $75,000, and approximately five thousand people a year visit the farms. The assessment on the property, which was some $35,000 in 1941, has risen to some $150,000 at the time of the trial in 1956.

The bad stretch of road cuts the farm in half and handicaps its operation. Valuable stallions and expensive vans cannot be subjected to the risks of using it. Almost all of the some sixty-five people who live on the farm, including the thirty school children, use Bel Air as a center and have to travel an extra eight miles to get there and back.

In their answer, the County Commissioners admit that: "Glenangus Farms constitute one of the finest developed farming operations in the East, that it is a credit and of great benefit to Harford County and the State, and agree that the

paving of the remaining mile of road would improve the Farms and the County, as will the paving of all the roads in the County; the program for paving to be arranged for 1956 may well include the road at issue here * * *."

The County Commissioners argue that any promises they made from 1942 to 1947 to pave the road were not contracts binding the county but were only statements of intention to improve the road whenever the county felt it was able, that if there were a contract it would be unenforceable because it lacked mutuality of obligation and dealt with a matter entirely in the discretion of a municipal corporation and because it would be *ultra vires*. They say further that any contract prior to 1951 would be barred by limitations—which they did not plead—and that there was no consideration for the claimed contract. We find it unnecessary to decide whether MacPhail or the Commissioners are correct in their respective assertions of fact and conclusions of law on matters that arose prior to 1954, because we think the decision in the case turns on what took place in that year.

After 1951, MacPhail and his counsel, Brodnax Cameron, kept urging the Commissioners to complete the work. Legal action was threatened several times, once in writing. Walker, who remained a County Commissioner from 1941 through 1954, testified that he was in favor of finishing the road because the Commissioners promised to do it and that he was in favor of "carrying out the promises that we had made * * *." but that the county road engineers were opposed to doing the work because the road did not have priority under the point system that they had established to measure the need of improvement, and their views prevailed. In late March or in early April, 1954, at the direction of MacPhail, Cameron prepared suit papers for the enforcement of the agreements to pave the road, and a copy was delivered to the attorney for the County Commissioners, who was told that the suit would be filed promptly if action were not forthcoming. A few days thereafter the Commissioners asked Cameron to confer with them at their meeting of April 19-20, 1954, and he did so. Cameron testified that the Commissioners— Walker, Spraker and Preston (the respondents in this case),

agreed to grade and base the road, if possible, in 1954 or, in 1955 at the latest, and to pave it in 1955. He said that Colonel Spraker and the other two Commissioners "said that they had decided to base and grade the MacPhail Road in 1954, if it possibly could be done * * * but, if they were not able to do it, they would base and grade it the first thing in 1955. They said,—Colonel Spraker said that it would be paved in 1955 regardless of whether it was based and graded in 1954 or 1955." Cameron asked that this decision be made a part of the official minutes and it was agreed that this would be done, and then, Colonel Spraker spoke up and said: " 'Mr. Cameron, I give you my personal word that this road will be based and graded this year, if possible; and, if not, then it will be based and graded early the next year, and it will be paved in 1955.' " Cameron testified further that: "The other two Commissioners gave me the same expressions. I was standing up by that time, we were all standing up, and they said that they would put that in the minutes and send me a copy * * *." There was introduced in evidence an extract from the minutes of the Commissioners' meeting, reading as follows: "Mr. Brodnax Cameron, Atty., appeared before the County Commissioners in regards to the MacPhail Road, requesting that the unimproved portion of the Mac-Phail Road between the properties of MacPhail and Livezey be improved.

"The County Commissioners assured Mr. Cameron that the road would be graded and the base put down in 1954, with the understanding that if this is not accomplished in 1954, they would definitely list the road for 1955.

"The County Commissioners for Harford County

Milton R. Walker, Chairman
Harry W. Spraker
B. Burdell Preston"

The chancellor found, we think correctly, that the forbearance to sue in the Spring of 1954 was good consideration for the promise of the County Commissioners to base, grade and pave the final stretch of the road. It is well established that forbearance to sue for a lawful claim and demand is good

consideration if the one forbearing honestly intended to prosecute litigation which is not frivolous, vexatious or unlawful (that is, litigation that has a reasonable basis) and which he believes to be well founded even though it may in fact be unfounded. *Snyder v. Cearfoss,* 187 Md. 635, 643; *Fiege v. Boehm,* 210 Md. 352, 360-1; *Hoffman v. Seth,* 207 Md. 234, 241; *Kolker v. Gorn,* 202 Md. 322. Enough has been said to show that the chancellor was justified in finding that MacPhail fully intended to sue on a claim that he believed, in the exercise of an honest, intelligent and reasonable judgment, to be well founded. Apparently, the County Commissioners, on the advice of their counsel, were not completely in disagreement with the soundness of that belief. We think the Commissioners had legal authority to make the agreement. Code, 1951, Art. 25, Secs. 1, 2, 3, 16 and 21; *Jenkins v. Riggs,* 100 Md. 427; *Riggs v. Winterode,* 100 Md. 439; *Huffman v. State Roads Commission,* 152 Md. 566; *Montgomery County v. Metropolitan District,* 202 Md. 293. The Commissioners admit that they agreed to grade and base the road in 1954 or, if not then, in 1955, and agree that they are obliged to do this much, but deny that the agreement included the paving of the road, or that they can be compelled to do the latter. This contention is somewhat difficult to understand because (a) the grading, aligning and the basing of the road would cost $20,000 and the paving but $5,000; and (b) the testimony showed that the practice of the county as to the roads that have been graded and based in any year but not paved, was to pave them the year following. In any event, the chancellor believed the testimony of Cameron as to what occurred at the meeting of the Commissioners, supported as it was by the testimony of the former roads engineer of the county that he understood the road was to be paved. He was dismissed from his job four days after he testified on deposition that when he asked "What about the MacPhail road", the County Commissioners told him to "forget it". The conclusion reached by the chancellor was supported, too, by testimony that the word "list" in the minutes of the County Commissioners, wherein they agreed that they would "definitely list" the road for 1955, had only one meaning to those concerned with roads in the county. The chancellor said:

"In view of the Board's contention in regard to the meaning of the word 'list' in the minute of April 1954, it becomes necessary to interpret the meaning thereof. The testimony shows that it is the practice of the County Commissioners to pave all roads listed on the annual road programs which are prepared near the end of each calendar year for the next. There is only one list prepared and that list shows only the roads which are to be completed by paving. There is no list of roads, if any, which are to be graded and based, but not paved.

"In addition, the portions of the same road which were previously improved in 1948, 1949, and 1951 were all paved promptly after grading and laying the base. In view of these admitted facts it is difficult to understand the respondents' contention that by listing the road they meant only to align, grade and lay the base. If that had been their understanding and intention they could easily have stated it in clear and unmistakable terms by changing or adding a very few words. The Court is of the opinion that under the circumstances of the case the only proper interpretation of the minute is that the Board, by adopting it, signing it and sending a certified copy thereof to the complainant agreed to complete the road not later than 1955 by aligning, grading, laying the base and paving the same in the same manner as the remainder of the road had been improved." We think these findings of the chancellor were fully justified.

The chancellor, noting that generally a court will not interfere with the discretion of public officials and, so, ordinarily will not tell the County Commissioners what roads to select for improvement or how improvements should be made, held that in the case before him, "* * * the Commissioners exercised their discretion by agreeing to improve the road under consideration." He added: "The purpose of this proceeding, therefore, is not to interfere with the County Commissioners in the exercise of their discretion but to require them to perform and carry out any agreements which they made in the exercise of their discretion. The Court is of the opinion that an injunction will lie under such circumstances." We concur. We think the evidence warranted the

action the chancellor took since the agreement he required to be executed was sufficiently definite and certain properly to be the subject of what, in effect, was specific performance, and since the fixing of the amount of a judgment for breach of contract would be almost impossible and a judgment would not be a duplicate or substantial equivalent of the promised performance. The testimony was clear that the county, in improving county roads, requires that they be aligned with lines of sight not less than two hundred fifty feet, to be at a grade not greater than five percent, have an eighteen foot wide base consisting of five inches of crushed stone and a sixteen foot wide paved surface, consisting of three inch penetration macadam. The decree merely directed the County Commissioners to construct the MacPhail road, as they had agreed to do, in accordance with this uniform and well defined practice. The authorities sustain the right of the chancellor to pass the decree he did. *Restatement, Contracts,* Secs. 358, 361(a), 361(c), 370—Illustrations 2 and 3, 371—Illustrations 3 and 4. See also *Snip v. City of Lamar* (Mo. App.), 201 S. W. 2d 790. The decree will be affirmed.

*Decree affirmed, with costs.*