## BALTIMORE COUNTY REVENUE AUTHORITY v. BALTIMORE COUNTY

[No. 186, September Term, 1957.]

*Decided May 10, 1958.*

The cause was argued before BRUNE, C. J., and HENDERSON, PRESCOTT and HORNEY, JJ., and CARTER, J., Chief Judge of the Second Judicial Circuit, specially assigned.

*A. Adgate Duer,* with whom were *Carroll W. Royston, Niles, Barton, Yost & Dankmeyer* and *Proctor, Royston & Mueller* on the brief, for the appellant.

*Walter R. Haile,* with whom were *Francis T. Peach* and *Richard C. Murray* on the brief, for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

This is a suit instituted originally to resolve two questions relating to bonds which the appellant, the Baltimore County Revenue Authority (the "Revenue Authority"), proposes to issue. The appellee is Baltimore County. The specific resolution here involved was adopted by the Board of County Commissioners of Baltimore County (the "County Commissioners") prior to the change from the County Commissioners to the charter form of government, but there is no claim that its validity or binding effect is affected or impaired by the change in the form of county government.

The case was instituted as a "Special Case by Consent" under Rule 329 of the Maryland Rules. The first question submitted for decision was, in substance, whether or not a resolution of the County Commissioners adopted on August 1, 1953, providing for the installation of parking meters, was in reality a revenue measure passed under the guise of an exercise of the police power and was invalid on that account. The trial court made a finding of fact that although it did produce some revenue it was not a revenue measure. The appellant does not challenge the correctness of that finding, and we shall, therefore, not consider that question.

The second question, which is the only one now pressed, goes to the validity of a resolution adopted by the County Commissioners on January 25, 1957. It is questioned because it undertakes to bind the County not to reduce the then existing number of parking meters on the streets and highways of the County and not to reduce the rates then charged for the use thereof so long as any bonds issued by the Revenue Authority for the purpose of financing the construction, acquisition and improvement of off-street parking facilities in Baltimore County are outstanding and unpaid. It is claimed that this constitutes an attempted abdication of a part of the police powers of the municipal body having to do with the control and regulation of traffic in the County and is an in-

valid attempt to restrict the future legislative action of the County.

The General Assembly enacted as Public Local Laws of Baltimore County two statutes which are immediately pertinent, Ch. 716 of the Acts of 1949 and Ch. 126 of the Acts of 1955. These are included in Everstine's Baltimore County Code, 1955 Ed., and references below to title and section numbers will be to that compilation.

Ch. 716 of the Acts of 1949, Title 30, Sec. 473, authorizes the County Commissioners to acquire and install parking meters on the public highways of the County and to adopt rules, orders and regulations for the use thereof. This power was exercised by the County Commissioners by a resolution adopted August 1, 1955, which provides, among other things, for the use of receipts from the meters in part "to provide space or facilities for off-street parking."

Ch. 126 of the Acts of 1955, Title 32, Secs. 542-548, inclusive, created the Baltimore County Revenue Authority as an instrumentality of the County Commissioners and, among other things, expressly authorizes it (by Sec. 544 (a)) to acquire, construct, equip and operate "parking facilities of every type and description" and (by Secs. 544 (b) and 546) to borrow money and issue revenue bonds to finance such facilities, and after such facilities are paid for to convey them to the County. Section 545 (b) of Title 32 authorizes the County Commissioners "to assign to the [Revenue] Authority any rates, rentals, fees or charges now being or hereafter received by it, such assignment to be made for the purpose of providing additional security for any bonds to be issued under this sub-title or for such other purposes as may be agreed to between the [Revenue] Authority and the County * * *." The reference to "this *sub*-title" (italics supplied) seems an obvious inadvertence. Neither party has raised any point with regard to it. Cf. *Pressman v. State Tax Commission*, 204 Md. 78, 88-90, 102 A. 2d 821, and cases therein cited. No question was raised in the trial court with regard to the possible effect of the omission from the actual assignment clause of the resolution of the County Commissioners of January 25, 1957, of the name of the assignee.

The appellant's brief in this Court calls attention to this omission, with the admission that it was not raised in the trial court. It was not submitted by the Special Case by Consent under Rule 329, and under Rule 885 of the Maryland Rules it is not properly before us. There is no reference whatever to any other question which might conceivably have been raised, such as the effect, if any, of Sec. 546(1) or of any related provisions of Title 30. We shall confine ourselves solely to the one question now properly raised and pressed on this appeal.

As to that question we find no substantial doubt. Whatever possible restriction on the exercise of the County's control over traffic there may be in the covenants here involved seems to us too slight to be of any substance. The resolution of January 25, 1957, expressly provides that the pledge not to reduce the number of parking meters or the rates charged for the use thereof, does not prevent an increase in the number of parking meters or in the rates or in the location of the meters. Neither the limited covenants not to reduce the number of meters or the rates nor the pledge of the receipts from the meters in excess of $25,000 a year, nor all of them together, in our view, involve a surrender of the police power of the County to control and regulate traffic.

Both sides agree that there is no case in this State directly in point and decisive of the question here presented.

The appellant cites two Maryland cases as tending to support its position. The first is *State, ex rel. McClellan v. Graves,* 19 Md. 351. There an ordinance for the opening of a street and the condemnation of property in connection therewith was later repealed. The appellant sought through *mandamus* proceedings to require the city to go forward with the opening and condemnation proceedings, so that the appellant would derive the benefits of a contract for materials from a house which was to have been demolished in the course of opening the street, but payment was not to be made until the city was in a position to make delivery after the assessment of benefits and damages. We think that insofar as here relevant, this case merely states the familiar rule that a municipality could not, by the adoption of an ordinance to

open a street through the exercise of its right of eminent domain; abridge its own legislative powers and so prevent the repeal of the ordinance. This court did, however, recognize that municipal corporations could validly bind themselves by contract, for it said (at pages 373-374): "Their contracts, when consummated and within their chartered powers, must bind them and their successors, whatever be the consequences." Such a contract was enforced in *Bd. of County Commrs. of Harford County v. MacPhail*, 214 Md. 192, 133 A. 2d 96.

The other Maryland case cited by the appellant in this connection is *Westminster Water Co. v. Mayor and Council of Westminster*, 98 Md. 551, 56 A. 990. In that case an ordinance which became a contract between a city and a water company that brought a supply of water into the city, provided that the city should levy a tax annually of five cents per one hundred dollars of property value and should pay the Water Company an amount not less than that produced by the assessment in the year 1883. A supplemental agreement provided that this should bind the parties and their successors in office forever. The tax was levied and paid until 1902, when the city repealed the ordinance. The Water Company brought *mandamus* proceedings to require the levy and payment of the tax. Judgment in favor of the city was affirmed. This court stated that a contract to pay a certain sum annually for a fixed period of years or providing a standard by which some definite sum could have been ascertained would have presented no difficulty because the legislative power of the city to levy the five cent rate of taxation (which was authorized by the Legislature) would not have been interfered with. This court, in speaking of the 1883 ordinance, said in part at 98 Md. 563: "Now, however, the legislative power, if Ordinance 62 is valid, has been completely parted with and no subsequent Common Council can exercise any discretion in reference to it, even though it is obvious that a five-cent levy is excessive." The ordinance was held invalid both as an attempt to bind succeeding common councils in the discharge of their legislative and governmental powers, and because a provision for levying taxes in excess

of the five cent rate if the amount realized thereby were less than in 1883 went beyond the authorization granted by the Legislature.

Neither of these cases seems even close to the instant case on the facts. We find here no abdication of legislative power or attempt to prevent its proper exercise in the future.

The rule recognized in most jurisdictions supports the power to pledge parking meter revenues as security for bonds issued to obtain funds to finance off-street parking facilities, as the resolution of January 25, 1957, undertakes to do with regard to the excess of such revenues over $25,000 a year.

*Rhyne on Municipal Law* (1957), Sec. 19-11, p. 456, states: "The courts in recent cases have upheld statutes and ordinances authorizing the pledge and use of the revenues derived from both off-street parking facilities and on-street parking meters to meet the costs of construction of, and to help sustain revenue bonds issued to finance off-street parking facilities. Some courts have, however, held that the combination of on-street and off-street facilities, operating as one undertaking, and the pledge of on-street parking meter revenues to secure revenue bonds for this purpose are improper. The majority of the courts have taken the opposite view that there is a sufficiently strong tie between on-street traffic regulation and off-street parking facilities to support the conclusion that on-street parking meter fees may properly be applied to the problem of traffic regulation as a whole."

The two cases cited in support of the minority view are *Britt v. Wilmington*, 73 S. E. 2d 289 (N. C.), and *Sammons v. Beaufort*, 83 S. E. 2d 153 (S. C.).

The underlying theory of the *Sammons* case appears to be that by adopting the combination of off-street parking facilities and on-street parking meter revenues to finance their cost, the municipality becomes committed for a long and possibly indefinite time to a system of traffic control and regulation which may become outmoded before all of the bonds issued to pay for the off-street parking facilities have been retired. We do not find this reasoning very persuasive. It seems to impose a severe restriction upon a municipality seeking to meet the ever pressing problem of traffic flow and

traffic congestion. If applied to the facts of the particular case before us, it would make a mountain out of the molehill representing the two rather mild restrictions agreed to by the County.

The tenor of the *Britt* case is against the majority rule stated by *Rhyne*. It is, however, distinguishable from the instant case on the ground that the statute there involved restricted the use of parking meter revenues exclusively to the regulation of parking on streets and highways. The appellant does not cite or rely upon this case.

The great weight of the decided cases is against the *Sammons* case.

In *Lynn v. Fort Lauderdale*, 81 So. 2d 511 (Fla.), the Supreme Court of Florida upheld the pledge of revenues from existing parking facilities for the acquisition of new facilities to be used for the same purpose. In so holding the court relied on *Gate City Garage, Inc. v. City of Jacksonville*, 66 So. 2d 653 (Fla.), and *State v. City of Miami Beach*, 47 So. 2d 865 (Fla.). In the *Miami Beach* case, the decree appealed from was affirmed *per curiam*, but there was a concurring opinion by Hobson, J., which was approved and was quoted in part in the *Lynn* case. Justice Hobson held in the *Miami Beach* case, as Judge Raine held in the Circuit Court in the instant case, that the municipal corporation was not going into the parking meter or parking facilities business for gain or profit. He then saw no lawful objection to the city obligating itself to fix rates and collect charges from its parking facilities to meet obligations under bonds, the proceeds of which were to be used solely for acquiring, equipping, maintaining and improving existing and additional parking facilities for the city. This purpose he found to be within the lawful exercise of the police power, and this holding was quoted with approval in the *Lynn* case.

In *Comereski v. City of Elmira*, 128 N. Y. S. 2d 913, 283 App. Div. 556, affd. 308 N. Y. 248, 125 N. E. 2d 241, an agreement between the City of Elmira and the parking authority of that city under which the city agreed not to reduce substantially the number of parking meters used in city streets during the existence of the agreement was held not to

be an illegal surrender of the city's governmental function and power.

An ordinance closely resembling the resolution here attacked was squarely sustained by the Supreme Court of Illinois as involving no surrender of the police power of a city in *Cherry v. City of Rock Island,* 8 Ill. 2d 97, 132 N. E. 2d 536, which cited and followed *Poole v. City of Kankakee,* 406 Ill. 521, 94 N. E. 2d 416. To the same effect are: *State ex rel. Bibb v. Chambers,* 77 S. E. 2d 297 (W. Va.); *Petition of City of Liberty,* 296 S. W. 2d 117 (Mo.); *Skidmore v. Elizabethtown,* 291 S. W. 2d 3 (Ky.); and *Gate City Garage, Inc. v. City of Jacksonville, supra,* 66 So. 2d 653 (Fla.)..

Other cases which have upheld pledges of parking meter revenues to finance off-street parking facilities, but which do not involve any claim of alleged abdication of the police power are: *State ex rel. Gordon v. Rhodes,* 107 N. E. 2d 206 (Ohio), and three decisions of the Supreme Court of Michigan, *Parr v. Ladd,* 36 N. W. 2d 157, *Petition of Detroit,* 62 N. W. 2d 626, and *Menendez v. Detroit,* 60 N. W. 2d 319. In the *Fort Lauderdale* and *Miami Beach* cases above cited, there was no covenant to maintain any specific number of parking meters, and these cases differ from the instant case in that respect. In *Brodhead v. City and County of Denver,* 247 P. 2d 140 (Colo.), the court did not pass upon a claim that there was an abdication of the police power for the reason that, in the absence of such a covenant, the question did not arise.

The judgment is affirmed.

*Judgment affirmed, with costs.*