O’CONNELL, Justice.
This is an appeal by the State from a final decree validating $935,000 of Parking Facilities Revenue Bonds proposed to be issued by the City of Tampa.
The proceeds of the bonds are to be used to finance the acquisition and construction of off-street parking facilities within the City. The City had not, previous to the date of the decree, acquired any such facilities but did have the usual on-street parking equipped with meters.
The principal and interest of the proposed bonds are to be paid solely from revenue from the proposed off-street parking and from on-street parking meters, the on-street meters and the proposed off-street facilities being combined into a single project for financing purposes as provided in § 183.07, F.S.A.
One of the sites, Site A, proposed to be acquired and used by the City as an off-street parking facility is owned by the Seaboard Airline Railroad Company and is presently used as a freight station.
To effect the acquisition of Site A, on July 22, 1958, the City and Seaboard entered into two agreements. The first, called “Exchange Agreement,” provided that Seaboard would convey the land comprising Site A to the City and remove certain tracks in exchange for which the City agreed to use its best efforts to acquire or cause to be acquired lands west of the downtown area of the City and convey same to Seaboard, it being provided that if the City could not acquire said lands Seaboard would condemn them at the City’s expense. In addition the City agreed to cause to be constructed on the lands acquired for Seaboard a new freight station, track, driveways and related facilities, and a storage track. The City’s obligation in the construction of the new freight station and related facilities and the storage track was limited to the sum of $525,000. The City was also obligated to do grading, paving and drainage in the conversion of an existing storage track into a team track, and to do various other things not necessary to be delineated. In the end Seaboard was to move its freight station operations to the new location, whereupon the City would convert Site A into an off-street parking facility.
In the second agreement, entitled “Construction Agreement,” Seaboard agreed to construct the new freight station and related facilities for a sum not to exceed $525,000, to be paid by the City, said sum to be placed in escrow in a bank in the City.
In its effort to upset the final decree the State raises two questions.
First, it says that the exchange agreement is violative of Art. IX, Sec. 10, Fla.Const., F.S.A., which forbids any city to obtain money for or to loan its credit to any corporation, association, or individual. The State contends that the result of the agreement is primarily to benefit a private corporation and therefore it is not for a public purpose. In support of its contentions the State relies heavily on this Court’s decision in Adams v. Housing Authority of City of Daytona Beach, Fla.1952, 60 So.2d 663. The State acknowledges that acquisition of Seaboard’s land, Site A, for an off-street parking facility is a recognized public purpose but argues that in this instance the public purpose is merely incidental to a private object.
Since the entry of the decree appealed from this Court in Herr v. City of St. Petersburg, Fla., 114 So.2d 171, settled adversely to it the first question presented by the State.
In the Herr case a similar “Relocation and Exchange of Property Agreement” was entered into between the City of St. Peters-burg and the Atlantic Coast Line Railroad. *846 Under that agreement, as in the “Exchange Agreement” in the case now before us, the City obligated itself to acquire certain lands, convey them to the railroad company, construct a new depot thereon, and do other things incidental to adopting the new site to use as a railroad terminal. In exchange the railroad agreed to convey certain of its downtown property to the City. Aside from details, the only major difference between the Herr case and that before us is in the method of financing. The City of St. Pe-tersburg in the Herr case did not propose to issue bonds to meet its obligations whereas the City of Tampa intends to do so.
In each case the evidence shows that the City is receiving property at least equal in value to the property to be conveyed to, and the cost of things to be done for, the railroad by the City.
In the opinion in the Herr case, in rejecting the contention of the appellants that the action of the City was violative of Art. IX, Sec. 10, Fla.Const., this Court said:
“But we find nothing in the contract here involved that amounts to a gratuitous aiding of the appellee railroad corporation, either by an appropriation of money or property or the lending of its credit to the corporation by the City. As noted above, the transaction amounts to an equal exchange of properties between the City and the railroad, both having the power of eminent domain; and it is well settled in courts of other jurisdictions that where, in furtherance of a public purpose, a body politic is authorized to condemn land, it may condemn other property and exchange it for that needed to accomplish such purpose. * * * ”
The Court noted that this doctrine is known as “compensation by substitution” and then cited cases and situations in which the doctrine had been employed and upheld.
The fact that in the Herr case the City used public funds obtained in a manner other than through issuance of bonds does not distinguish that case from this one. In both cases the basic issue was the same, i. e., did the City “ * * ‡ obtain or appropriate money for, or * * * loan its credit to, any corporation. * * * ” It matters not what method was used to obtain the funds so long as they are public funds.
We conclude therefore on authority of the Herr case that the arrangement between the City and Seaboard was not violative of Art. IX, Sec. 10, Fla.Const.
In the Second question raised by it the State assaults a covenant contained in the ordinance authorizing the issuance of the bonds in question. In part the covenant reads as follows:
“The City further covenants that it will not discontinue the operation and maintenance of any of the on-street parking meters which are now installed at or near the curbs of the streets in the City, that it will continue in effect the present rates and charges for the use of such on-street parking meters, and that such rates and charges will not be reduced except as hereinafter provided in this Article; provided, however, that substitutions or changes may be made in the locations of parking meters which are necessary to permit street widening or street closings or to provide necessary regulation of traffic and relief of congestion and which will not materially lessen the income and revenues to be derived from such meters.”
While the State admits that revenues of on-street parking meters may be used in the financing of off-street parking facilities, it takes the position that in this instance the covenant amounts to an unlawful relinquishment by the City of its sovereign right and duty to regulate traffic under its police power.
In support of this contention the State cites the case of City of Panama City v. State, Fla.1952, 60 So.2d 658. It states *847 that the last cited case is the only instance in which this Court has passed upon a similar covenant, which as we shall show later herein is not correct.
We have examined both the opinion and the record on file in this Court in the City of Panama City case. We find that the chancellor in his final decree expressed disapproval of the covenant regarding the continued use of the parking meters, but on appeal the question of the validity of the covenant was not made an issue by the parties. The statement in this Court’s opinion was therefore obiter dictum.
More important, the covenant in the City of Panama City case was materially different and more restrictive on the City than the one in this case. In that case the City obligated itself to maintain the existing meters and rates throughout the life of the bonds, without any reservation of power in the City to change the location of the meters to permit street widening or closings or to provide necessary regulation of traffic and relief from traffic congestion, whereas in the instant case the covenant contained such reservation. This reservation of power in the covenant now under consideration distinguishes it from that in the City of Panama City case and in our opinion renders it immune to the attack made upon it here.
The police power is a proper subject of legislative action limited only by our constitutions. The legislature has granted cities the power to uses parking meters in exercise of the police power and in § 183.07, supra, specifically authorized cities to pledge the revenues gained therefrom to the payment of bond projects for purposes such as sought in this case. Common sense impels the conclusion that such pledging would be worthless without some guarantee of the continuation of the source of the funds pledged. It follows that the grant of the authority to pledge these revenues must have included the authority to include in the pledge reasonable guarantees of the continued employment of the meters at locations where needed in traffic regulation. So long as the guarantee or covenant does not remove from the City and place in the hands of the bondholders or someone else the power to determine the location and relocation of the meters as needed in the exercise of the police power in the regulation of traffic, we think that the covenant is reasonable and within the intendment of the statute and not a relinquishment or abdication of the police power so as to render it void.
Furthermore, while it is not specifically so stated in the reported opinion, the record on file in this Court shows that the identical question here involved was presented to this Court in Lynn v. City of Ft. Lauderdale, Fla.1955, 81 So.2d 511. In that case the City pledged both on-street and off-street parking meters revenue to payment of a bond issue to be used for purposes similar to those in this case. In the decree appealed from the chancellor held that the conditions of the covenant, which he recited in some detail, and which was almost identical to that in this case, did not constitute an unlawful delegation of the police power of the City.
On appeal to this Court in the Lynn case the appellants squarely presented that question to this Court. The Court recognized the question and answered it on page 512 of 81 So.2d, stating that it found nothing unlawful in the plan to pledge the revenue from existing facilities, which of necessity had to refer to on-street parking, and that the question of obligating itself to fix and maintain fees and facilities throughout the life of the bonds had been answered in State v. City of Miami Beach, Fla.1950, 47 So.2d 865. While we do not here intend to indicate that we feel the case of State v. City of Miami Beach, supra, directly controls the question before us and it may not have been properly cited in support of the decision in the Lynn case, the Lynn case is nevertheless authority for our decision here rendered.
*848 While the Lynn case itself is sufficient precedent upon which to answer the State’s second question in the negative there is also ample precedent from other jurisdictions to support our view.
"The State cites the case of Sammons v. City of Beaufort, 1954, 225 S.C. 490, 83 S.E.2d 153, in support of its position. That case does support the State, but it represents the minority view.
The majority view accords with the conclusion we have reached in this case and is reflected in the cases cited below. These cases establish the weight of authority to be directly contrary to the holding in Sammons v. City of Beaufort, supra. We choose to align ourselves with them. The cases to which we refer are: Skidmore v. City of Elizabethtown, Ky.1956, 291 S.W.2d 3; State ex rel. Bibb v. Chambers, 1953, 138 W.Va. 701, 77 S.E.2d 297; Comereski v. City of Elmira, 1954, 283 App.Div. 556, 128 N.Y.S.2d 913; Poole v. City of Kankakee, 1950, 406 Ill. 521, 94 N.E.2d 416; Petition of City of Liberty, Mo.1956, 296 S.W.2d 117; City of La Mesa v. Freeman, 1956, 137 Cal.App.2d 813, 291 P.2d 103; Baltimore County Revenue Authority v. Baltimore County, 1958, 216 Md. 553, 141 A.2d 147; and Cherry v. City of Rock Island, 1956, 8 Ill.2d 97, 132 N.E.2d 536.
For the reasons above expressed the decree of validation is Affirmed.
THOMAS, C. J., and TERRELL, HOB-SON and TFIORNAL, JJ., concur.