WINCAMP PARTNERSHIP, OTC Partnership, Jackson Grove Limited Partnership and Maryland National Realty Investors, Inc.

v.

ANNE ARUNDEL COUNTY, MARYLAND, Thomas D. McKewen, Director, Maryland Environmental Service, James B. Coulter, Secretary, Maryland Department of Natural Resources, Neil Solomon, Secretary and Maryland Department of Health and Mental Hygiene.

Civ. No. K–76–937.

United States District Court,
D. Maryland.

Sept. 7, 1978.

1010

Thomas M. Downs and C. Fred Delavan, Annapolis, Md., for plaintiffs.

Francis B. Burch, Atty. Gen. of Md., and Warren K. Rich, Randall M. Lutz, Baltimore, Md., and Richard E. Rice, Annapolis, Md., Asst. Attys. Gen. of Md., for defendants McKewen, Coulter and Solomon.

Michael R. Roblyer, County Sol. for Anne Arundel County, Md., and John M. Court and Thomas G. Redman, Asst. County Solicitors for Anne Arundel County, Md., Annapolis, Md., for defendant Anne Arundel County.

FRANK A. KAUFMAN, District Judge.

Several land developers with holdings in Anne Arundel County, Maryland, challenge the constitutionality of various alleged actions and omissions of that County and of officials of several state agencies ("state defendants"). Plaintiffs allege that these actions and omissions have, contrary to the federal Constitution and in violation of Maryland statutes, unlawfully impeded plaintiffs' ability to develop their land. Jurisdiction exists under 28 U.S.C. § 1331 with respect to plaintiffs' federal constitutional claims, *Donohoe Constr. Co., Inc. v. Montgomery County Council,* 567 F.2d 603, 607 (4th Cir. 1977), and under the doctrine of pendent jurisdiction with respect to plaintiffs' state law claims. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

## I. FACTS

The facts are largely undisputed. Three of plaintiffs—Wincamp Partnership ("Wincamp"), OTC Partnership ("OTC"), and Jackson Grove Limited Partnership ("Jackson Grove")—are owners of undeveloped tracts of land totalling about 580 acres in a section of the County known as the Odenton Town Center.[1] That land is located in a part of Anne Arundel County served by a public sewage collection system which drains into the Patuxent Wastewater Treatment Plant, a county-operated sewage treatment facility. The fourth plaintiff, Maryland National Realty Investors, Inc. ("Maryland National"), provided financing to the other three plaintiffs for the pur-

---

1. Wincamp owns three parcels of land comprising 319 acres known as the Campbell Tract, the Glenn Gall Tract, and the Leffet Tract. OTC owns two parcels totalling about 200 acres which are known as the Merchants Mortgage Tract and the Joseph Smith Tract. Jackson Grove owns about 61 acres of land in two parcels known as the Jackson Grove Tracts.

chase of various tracts of land in the County.

In purchasing those properties, plaintiffs say that they relied upon the County's General Development Plan and, in particular, its Odenton Development Plan. The General Development Plan, designed to provide a guide to the future development of the County, was adopted by the County Council in 1968. Subsequently in 1972, the Council adopted the Odenton Development Plan as part of the general plan. The Odenton Town Center was zoned for residential use with maximum densities of five to twenty-two units per acre. Plaintiffs also contend that they relied on the informal projections of several engineers in the County Department of Public Works concerning when public water and sewerage facilities would be available. The County denies that it has made any representations to plaintiffs regarding land use or capital facilities other than in direct response to specific inquiries by plaintiffs. Plaintiffs and the County have stipulated that no alleged representation or commitment by the County to furnish public sewer to any of plaintiffs occurred after July 17, 1974.

Before a developer of a subdivision can obtain final approval of a subdivision plat by the County, the developer is required to submit a sketch plan, a preliminary plan, and a final plan with regard to the subdivision. *See* Anne Arundel County Code § 13–101 *et seq.* Development of the various tracts owned by plaintiffs has advanced through different stages of the administra-

tive process. None of the developments, however, has yet reached the stage of submission of a final plat.

Under an amendment to a Maryland statute which became effective in July 1974, County authorities are prohibited from approving subdivision plats or granting building permits unless projected sewerage facilities are adequate to serve the proposed development.[2] According to correspondence referenced in the second amended complaint, plaintiffs were warned by County officials as early as February of 1974 that sewer connections were contingent on expansion of the Patuxent Wastewater Treatment Plan from its two million gallons per day (M.G.D.) capacity to four M.G.D. In 1975, certain County officials informed the developers of Odenton Town Center that no final plats were being approved in the Patuxent Wastewater Treatment Plant service area because of that plant's lack of capacity. The Patuxent plant was expanded to four M.G.D. capacity in 1976, but that capacity was allocated to approved subdivision plats which preceded the Odenton Town Center development. In 1975, County and State health officials informed plaintiffs that no final plats would be approved until additional capacity at the Patuxent plant became available. Plaintiffs and the County have stipulated that the present sewage flow through the plant is between 3.1 and 3.3 M.G.D., leaving a present unused but committed capacity of between .7 and .9 M.G.D. The average daily flow through the plant during May 1977 was 2.908 M.G.D.

2. That statute now provides:

3. No State or local authority empowered to grant building permits or to approve subdivision plans, maps, or plats, shall grant any such permit or record or approve any such plan, map, or plat which provides for individual or community water supply or sewerage systems, or for solid waste acceptance facilities, unless such systems or facilities are found to be in conformance with the county plan, amendments, or revisions thereof. This means that:

(i) No building permit shall be approved (1) where existing facilities are inadequate to serve the proposed development, taking into consideration all other existing and approved developments in the service area, or (2)

which will cause facilities for conveyance, pumping, storage or treatment of water, sewage or solid waste to be overloaded.

(ii) No subdivision plat shall be approved in areas where, taking into account all existing and approved subdivision plats and building permits in the service area, facilities for conveyance, pumping, storage, or treatment of water, sewage and solid waste to serve the proposed development would either (1) not be completed in time to serve the development, or (2) if completed, would not be adequate to serve the development without causing overloading of the facilities.

Md.Ann.Code art. 43, § 387C(d)(3) (1977 Cum. Supp.) (last two sentences added by 1974 amendment).

The County and plaintiffs have also stipulated that none of plaintiffs have filed for either a building permit or a sewer connection permit for the Odenton Town Center properties. Neither building permits nor sewer connection permits would, in any event, be available to the properties at the maximum zoning density permitted until additional sewer capacity is available.[3] The County and plaintiffs have also stipulated that the only public sewerage available to plaintiffs' properties is the sanitary sewer system operated and maintained by the County.[4]

The defendant Maryland Environmental Service is a governmental corporation organized under the laws of Maryland and existing under the aegis of the Maryland Department of Natural Resources. According to a stipulation entered into by plaintiffs and state defendants on July 11, 1977, the following facts are seemingly established as they affect those parties:

The Maryland Environmental Service (the "Service") has, in the past, engaged in certain studies and made certain proposals, hereinafter described, relating to a Central Patuxent Regional Wastewater Treatment Plant, but none of those studies or proposals have had any binding effect on the decisions or activities of Anne Arundel County, Maryland concerning operation or improvement of the existing Patuxent Wastewater Treatment Plant. In the early part of the 1971 calendar year, the Service on its own initiative made a study of the feasibility of a Central Patuxent Regional Wastewater Treatment Plant. The Service then proposed its concept to the various political subdivisions, including Anne Arundel County, Maryland, which if that concept were implemented would contribute sewage flows to the regional facility. Because the concept was not initially embraced by those political subdivisions, and despite preliminary approval of the concept by the State Department of Health and Mental Hygiene, the Service commissioned a further feasibility study by an independent consultant, Engineering-Science, Inc. ("ESI"). The ESI study was completed in October, 1971, and later revised as of August 20, 1972. While neither the initial study by the Service nor

**3.** Apparently each of plaintiffs' parcels is now eligible for *single* connections to the County sewerage system.

**4.** Under regulations of the State Department of Health and Mental Hygiene, an interim individual sewerage system may be installed when the public system is inadequate or unavailable to the landowner. Section 10.03.26.05 of the Maryland Agency Rules and Regulations reads:

.05 INDIVIDUAL WATER SUPPLY AND INDIVIDUAL SEWERAGE SYSTEMS

The installation of individual water supply or individual sewerage systems shall be subject to the following requirements:

A. An individual water supply or individual sewerage system may not be permitted to be installed where an adequate community water or sewerage facility is available. If an existing community water or sewerage facility is inadequate or is not available, an interim individual water and sewerage system may be used as set forth in B(1), B(2) and B(3), below:

B. Interim individual water supply and sewerage systems may be permitted to be installed in any portion of the county, except where otherwise prohibited, where community systems will be programmed for construction within the S-1-2, 3 and 4 and W-1-2, 3 and 4 service categories provided that:

(1) Such interim systems are adjudged by the local health department to be adequate, safe, and in compliance with pertinent State and local regulations, including minimum lot ownership as set forth in Regulation 10.03.-28.02 and .03;

(2) Permits for such interim systems shall bear a notice regarding the interim nature of the permit and stating that connection to a future community system shall be made within 1 year or less after such system becomes available;

(3) If interim systems are used, provisions shall be made, whenever possible, to locate such systems so as to permit connection to the public facilities in a most economical and convenient manner.

C. . Individual water supply or sewerage systems, not of an interim nature, shall be permitted to be installed in any portion of the county designated as S-5 and 6, and W-5 and 6 where community systems are not planned. Such installations shall be governed by the Regulations under 10.03.27 and 10.03.28 as minimum requirements.

There is no indication in the record that plaintiffs have attempted to utilize an interim, individual system.

the ESI study was mandated by Federal law, either study would have been sufficient for purposes of justifying a Federal grant application for design of the proposed facility, prior to enactment of the 1972 Federal Water Pollution Control Act Amendments (P.L. 92–500) enacted into law on October 19, 1972. However, no application for grant assistance was made at that time because of lack of support for the regional concept from the affected political subdivisions. As the Maryland agency responsible for preparation of Comprehensive River Basin Management Plants pursuant to Section 102 of the 1972 FWPCA Amendments, the Service on July 15, 1973 commissioned the development of a Patuxent River Basin Wastewater Management Plan by an independent consultant, Matz, Childs & Associates, Inc. ("MCA"). The MCA plan incorporated the feasibility studies performed by the Service and ESI and called for construction of a regional wastewater treatment facility to service the Central Patuxent Area. On the basis of the aforementioned studies and planning activities, in 1973, the political subdivisions with jurisdiction in the Central Patuxent Area entered into negotiations with the Service concerning design and construction of a Central Patuxent Regional Wastewater Treatment Plant. Because the 1972 FWPCA Amendments and the regulations promulgated thereunder by the United States Environmental Protection Agency required preparation of a "Step I Facility Plan" prior to award of any Federal grant for design or construction, negotiations concerning the design and construction of the plant were deferred.

On October 1, 1974, the Service entered into a contract with Anne Arundel County, Maryland; the City of Bowie (located in Prince George's County, Maryland); and the Washington Suburban Sanitary Commission, under the terms of which the Service was to engage a consultant to prepare a Step I Facility Plan for the Central Patuxent Study Area.

Chapter 732 of the Acts of Maryland of 1974 created the General Professional Services Selection Board within the State Department of General Services, making it and the Board of Public Works of the State of Maryland responsible for the procurement on behalf of all State agencies (except the Department of Transportation) of architectural or engineering services where the compensation for such services is in excess of $25,000.00. On September 5, 1975, General Professional Services Selection Board selected Betz Environmental Engineers, Inc. to prepare a Step I Facility Plan for the Central Patuxent Area, and the Board of Public Works approved the selection of that consultant at its meeting on September 22, 1975. On January 8, 1976 the Service entered into a contract with Betz Environmental Engineers, Inc. for preparation of the Step I Facility Plan. That Plan is almost complete at this date.

At a public meeting on June 29, 1976, the Maryland Environmental Service recommended that each jurisdiction participating in the Step I Facility Plan, including Anne Arundel County, Maryland, formulate its policy regarding the proposed Central Patuxent Regional Wastewater Treatment Plant and submit this policy in writing to the Maryland Environmental Service.

In a letter dated August 27, 1976, the County Executive for Anne Arundel County informed the Maryland Environmental Service that the County had determined not to participate in any regional facility and would rather plan, design, and construct wastewater treatment facilities in the Patuxent area for County residents when and as the County deemed the same necessary and appropriate.

The County's current Master Plan for Water Supply and Sewerage Systems,[5] which was adopted by the County Council on March 7, 1977 and which covers the fiscal years 1977–96, projects that the population of the Patuxent plant service area will grow from 32,699 in 1975 to over 80,000

**5.** Such plans are adopted pursuant to Md.Ann. Code art. 43, § 387C and are subject to the review and approval of the State Department

of Health and Mental Hygiene. *See* p. 1021, *infra.*

by the turn of the century. The Plan recommends that the Patuxent plant be expanded to 8 M.G.D. capacity to serve the projected growth through 1996. Thereafter, a second expansion will be necessary for the area to absorb additional population.

After plaintiffs instituted this case in 1976, an appropriation of $2,629,000 for design and construction required to double the capacity of the Patuxent plant was included in the proposed County budget for the fiscal year 1977–78. That sum was deleted from the County budget when the County Council passed the final budget on May 31, 1977. However, on December 5, 1977, the County Council passed Bill No. 121–77, which transferred $2,629,000 in the Capital Improvement Budget from other projects toward the expansion of the Patuxent plant. According to a letter by an Assistant County Solicitor to this Court, dated October 19, 1977, that transfer of funds constituted the first step toward providing plaintiffs with sewerage capacity for their properties by approximately 1982 and allowing them to obtain building permits. Plaintiffs seemingly have not disputed the facts stated in that letter, but have not conceded to it any materiality or relevancy.

Finally, the County and plaintiffs have stipulated that the County has collected and continues to collect "front-foot benefit charges" and "capital facility" assessments from Wincamp and OTC for sewer lines to Wincamp's Campbell Tract and to OTC's Merchants Mortgage Tract. Due to the lack of available sewer capacity, only permits for connections for one residential unit per each of those two tracts can be issued by the County. Both tracts were assessed a front-foot benefit assessment for sewer in 1974 as undeveloped parcels for which no final subdivision plat has been recorded. Those assessments remain current for those properties.

Against that factual background, plaintiffs assert that defendants have violated both state and federal law, although most of their allegations are phrased in terms of federal law. In particular, plaintiffs contend that there has been a taking of their property without just compensation in violation of the Fifth and Fourteenth Amendments. Plaintiffs also contend that defendants have infringed upon plaintiffs' substantive due process rights and the right to travel of future inhabitants of Anne Arundel County.

With respect to defendant County in particular, plaintiffs allege that the County has used its police power in an arbitrary, capricious, and unreasonable manner to impose a "de facto moratorium" on the provision of sewer service in order to inhibit growth and exclude potential inhabitants. Plaintiffs also claim that the County's collection of sewer benefit assessments without the provision of sewer service violates the Fifth and Fourteenth Amendments. Plaintiffs additionally argue that the County has violated state law, in particular Md.Ann.Code art. 43, § 387C, in not developing an interim or permanent sewage treatment plan.

The State defendants are the Director of the Maryland Environmental Service, the Secretary of the Maryland Department of Natural Resources, and the Secretary of the Maryland Department of Health and Mental Hygiene. The gist of plaintiffs' claims against those defendants appears to be that they have unreasonably exercised (or failed to exercise) the state police power in not proposing or implementing programs to alleviate the shortage of sewerage capacity in the County. Plaintiffs further allege that State defendants have failed to comply with various state statutes which, plaintiffs say, require them to compel the County either to build new sewage treatment facilities or to have their departments build such facilities.

For relief, plaintiffs seek a declaration that the various alleged unlawful actions and omissions of defendants violate the due process and equal protection clauses of the Fourteenth Amendment and infringe upon the right to travel of future generations. In addition, plaintiffs ask for affirmative injunctive relief and damages. Specifically, plaintiffs ask this Court to direct defendants to devise a detailed plan and timetable for the prompt provision of sewage service

to plaintiffs' properties. Plaintiffs' monetary damage claims, stated at one or more times in this case, against the County include interest paid on mortgages and notes during the delay in the development of the properties, and refunds from the County of allegedly illegally collected taxes, fees, and charges,[6] attorneys' fees, and costs.[7] While the parties have filed at one or more times motions to dismiss or for summary judgment and assert their entitlement to the same, they have submitted the case on the record in a non-summary judgment context for findings of fact and determinations of law by this Court.

## II. ABSTENTION

The State defendants contend that since this case involves a dispute over local land use and utilities, this Court should abstain from reaching the merits of plaintiffs' claims. In *Colorado River Water Cons. Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), the Supreme Court wrote that "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Id.* at 813, 96 S.Ct. at 1244. Mr. Justice Brennan, writing for the majority, stated that there are three categories of circumstances appropriate for abstention. Two of those categories may apply in this case. The third, abstention relating to certain types of state proceedings such as criminal, nuisance and tax, is inapplicable herein. *Colorado River, supra* at 816–17, 96 S.Ct. 1236.

### A.

Abstention is appropriate "in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law." *County of Allegheny v. Frank Mashuda Co.,* * * [360 U.S. 185, 189, 79 S.Ct. 1060, 3

L.Ed.2d 1163 (1959)]. See, e. g., *Lake Carriers Assn. v. MacMullan,* 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); *United Gas Pipeline Co. v. Ideal Cement Co.,* 369 U.S. 134, 82 S.Ct. 676, 7 L.Ed.2d 623 (1962); *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

*Id.* at 814, 96 S.Ct. at 1244.

■ If, as plaintiffs allege, State defendants can be required by a statutory obligation to compel the expansion of the Patuxent Plant or to construct it themselves, then the federal constitutional issues posed by plaintiffs will become moot if such defendants are required to so act. There are virtually no Maryland cases construing the Maryland statutes upon which plaintiffs rely (Md.Ann.Code art. 43, § 387A *et seq.*). However, the extent of the State defendants' obligations thereunder is well defined by the statutes themselves.[8] Those statutes cannot be read as plaintiffs suggest. Accordingly, the federal constitutional claims stated by plaintiffs are not mooted because of any doubtful construction of such state statutes.

### B.

The second set of circumstances in which abstention is described as appropriate in *Colorado River* is the following:

Abstention is also appropriate where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar. *Louisiana Power & Light Co. v. City of Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959), for example, involved such a question. In particular, the concern there was with the scope of the eminent domain power of municipalities under state law. See also

---

**6.** By letter to this Court dated March 16, 1978, and included in the court file in this case, plaintiffs' counsel informed the Court that plaintiffs were agreeable to a dismissal without prejudice of their claims against the County for damages with respect to taxes, fees, and other charges.

**7.** The County is a person suable under 42 U.S.C. § 1983, *see Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

**8.** *See* pp. 1021–1024, *infra.*

*Kaiser Steel Corp. v. W. S. Ranch Co.,* 391 U.S. 593, 88 S.Ct. 1753, 20 L.Ed.2d 835 (1968); *Hawks v. Hamill,* 288 U.S. 52, 53 S.Ct. 240, 77 L.Ed. 610 (1933). In some cases, however, the state question itself need not be determinative of state policy. It is enough that exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern. In *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), for example, the Court held that a suit seeking review of the reasonableness under Texas state law of a state commission's permit to drill oil wells should have been dismissed by the District Court. The reasonableness of the permit in that case was not of transcendent importance, but review of reasonableness by the federal courts in that and future cases, where the State had established its own elaborate review system for dealing with the geological complexities of oil and gas fields, would have had an impermissibly disruptive effect on state policy for the management of those fields. See also *Alabama Pub. Serv. Comm'n v. Southern R. Co.,* \* \* \* [341 U.S. 341, 361, 71 S.Ct. 762, 95 L.Ed. 1002 (1951) (Frankfurter, J., concurring in result)].

424 U.S. at 814–15, 96 S.Ct. at 1244–45 (footnote omitted).

When assessed against those latter criteria, this case appears to be one in which abstention might well be appropriate. A decision by this Court might indeed upset the efforts of the State to establish a coherent policy with regard to residential growth, pollution and sewerage treatment. Plaintiffs do herein substantially challenge Maryland's rather complex environmental and land use policy.

In several recent cases, federal courts have chosen to abstain from constitutional challenges to local land use regulations. In *Fralin and Waldron, Inc. v. City of Martinsville,* 370 F.Supp. 185 (W.D.Va.1973), *aff'd,* 493 F.2d 481 (4th Cir. 1974), a real estate developer brought suit against a city and its

agencies for refusal either to grant a special use permit or to approve a subdivision plan for an apartment complex—a project qualifying for mortgage insurance under the federal Housing and Urban Development Act. Plaintiffs therein sought to have part of the zoning ordinance declared unconstitutional on the grounds of vagueness and discriminatory application. Chief Judge Turk analyzed in detail the Fourth Circuit case law on abstention, *see* 370 F.Supp. at 191–92, and concluded that abstention was appropriate. In so doing, Judge Turk observed that "the case at bar involves the power over local land use—the limits of which are traditionally and appropriately left to the states in the first instance" (*id.* at 191), and that "the plaintiff is alleging defects . . . which may be disposed of by a state court decision or at least modified for purposes of adjudicating the constitutional claims." (Id. at 192). Affirming in a Fourth Circuit opinion, Mr. Justice Clark (sitting by designation and writing for himself, Judge Craven, and Judge Widener) wrote:

> \* \* \* All of its [plaintiff's] claims raise legitimate questions involving municipal zoning ordinances, the correct construction of local land use law as to special use permits, and the delineation of the proper scope and exercise of local administrative discretion. Understandably, the courts of Virginia have extensive familiarity and experience with such matters, and we believe that they should have the initial opportunity to pass upon them. A state adjudication may well avoid the necessity of a decision on the federal constitutional question presented as well as avoid needless friction in federal-state relations over the administration of purely state affairs. We conclude that the requisite special circumstances warranting abstention are present here and that the case is controlled by *Louisiana Power and Light Company v. City of Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959). Also see [citations omitted].

493 F.2d at 482–83.

Very recently, in *Kent Island Joint Venture v. Smith,* 452 F.Supp. 455 (D.Md.1978),

a land developer alleged that the County Commissioners and various other County officials had entered into a conspiracy to prevent development of property owned by the plaintiff. Plaintiff claimed that a temporary subdivision moratorium imposed by the County Commissioners, enactment of an amended County Master Water and Sewerage Plan, various alleged misrepresentations with respect to the amended plan, and the application of strict soil percolation standards to the property combined to inhibit development. Plaintiff claimed that the County's water and sewerage classification of plaintiff's land was unreasonable and unrelated to the public health, safety, or welfare. Judge Harvey, after thoroughly reviewing the law of abstention, abstained from deciding that latter claim. *See Kent Island Joint Venture v. Smith, supra,* at 461–64. Noting that "[t]hese claims are classic assertions cognizable under Maryland land use and zoning law" (*id.* at 463), he held that plaintiff would have to pursue its remedies in the state courts. Judge Harvey wrote:

> This Court is satisfied that plaintiff must challenge these land use decisions of Queen Anne's County officials in the state courts of Maryland. The dispute here is strictly a local matter as to which federal intervention is both unwise and unwarranted. The reasonableness of zoning and other land use classifications is a question of state law, the resolution of which could avoid or modify related federal constitutional issues. *See, e. g., Fralin and Waldron, Inc. v. City of Martinsville, Va., supra.* Accordingly, *Pullman*-type abstention is appropriate. Equally important is the fact that state land use policy is a sensitive matter subject to comprehensive local regulation. For a federal court to exercise its jurisdiction in areas of important state domestic policy creates an "unseemly conflict between two sovereignties [and] the unnecessary impairment of state functions * * *." *Martin v. Creasy,* 360 U.S. 219, 224, 79 S.Ct. 1034, 1037, 3 L.Ed.2d 1186 (1959).

Accordingly, *Burford*-type abstention is also appropriate here.

*Id.* (Footnote omitted). *See also Planned Parenthood of Maryland, Inc. v. Mayor and Aldermen of the City of Annapolis,* Civil No. N–78–501 (D.Md. April 7, 1978) (abstention proper in action challenging City's refusal to issue occupancy permit based on City's zoning code).[8A]

This case differs somewhat from *Kent Island Joint Venture.* In this case plaintiffs do not challenge the County's classification of their properties. Plaintiffs apparently are satisfied with the zoning status of their land. Rather, they attack the County's legislative decision regarding the timetable for expansion of sewage treatment facilities in their area and the State's alleged failure to prod or supersede the County in providing such facilities. Such claims, it can be argued, are not "classic assertions" cognizable under state land use and zoning laws.

In *Santa Fe Land Improvement Co. v. City of Chula Vista,* 71 F.R.D. 573 (S.D.Cal. 1976), an inverse condemnation action challenging municipal rezoning of industrial property, it was held that California courts should be the initial interpreters of that State's statutory program of land use. The federal district court found abstention appropriate under the first two categories of *Colorado River:*

> The instant case similarly entails an integrated scheme of state statutory and constitutional law, much of which has not been interpreted by the state courts. For example, plaintiff challenges the alteration of the Specific and General Plans and the rezones as unlawful exercises of the City's police power; as such, an evaluation of the City's compliance with state and municipal law is necessarily germane. California land use law is a complex statutory matrix governing, *inter alia,* the requisites of a General Plan, the requisites of a Specific Plan, necessary consistency between the Specific Plan and zoning ordinances, and the preservation of open space. Additionally, much of the

---

**8A.** A copy of that opinion has been placed in the court file in this case.

statutory law, particularly that relating to open-space zoning, has not been interpreted by the courts of the State of California. To require this Court to fill any breach of the interpretation of state statutory law would mean not only that the federal court would have a primary role in shaping state land use law but might also make determinations in conflict with subsequent rulings by the state courts. Deference to the state courts at this juncture would be the preferable alternative.

Abstention is also appropriate under the second category of circumstances expressed by the Court in the *Colorado River* case. This case does indeed present difficult questions of state law, whose resolution will substantially affect sensitive areas of state policy; moreover, the importance of the result in the instant case may well transcend the parties litigant. This case involves efforts by the City to comply with state statutes governing the establishment of open-space zones, and the establishment of land use plans to effect that end. Assuming, as contended by the City, that it has followed procedures not unlike that of hundreds of sister cities throughout the state, a ruling by this Court might disrupt state efforts to establish a coherent policy concerning land use, and specifically, open-space zoning. Although *stare decisis* regularly imparts the decisions of this court to nonparties, the court is reluctant to make an impact on state entities, given the sensitive nature of the state policies involved. The course of abstention will best aid the court in avoiding "needless conflict with the administration by a state of its own affairs." Wright, *Federal Courts* 199 (2d Ed. 1970); *see also, Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). Having filed an action in state court, plaintiff has an adequate forum to litigate not only the constitutional questions raised by the first cause of action but also the questions peculiar to state and local law in the remaining causes of action; therefore, in-

tervention by this Court is neither necessary nor appropriate. *Alabama Public Service Commission v. Southern Ry. Co.,* 341 U.S. 341, 349, 71 S.Ct. 762, 768, 95 L.Ed. 1002 (1951).

71 F.R.D. at 576 (footnotes omitted).

*See also Dells, Inc. v. Mundt,* 400 F.Supp. 1293, 1298 (S.D.N.Y.1975) (Wyatt, J.) ("local land use, a subject peculiarly appropriate for the state courts"). Herein, plaintiffs have not filed an action in state court, as did plaintiff in the *Santa Fe* case. Nor is it entirely clear that plaintiffs in this case can so do.[9]

The case law is not unanimously in favor of abstention in the circumstances which prevail in this case. In *Donohoe Construc. Co., Inc. v. Montgomery County Council,* 567 F.2d 603 (4th Cir. 1977), the Fourth Circuit held that abstention was inappropriate in an action in which plaintiff alleged a taking of property without due process as a joint result of zoning plans, ordinances, a sewer moratorium, and building permit decisions. Judge Winter (writing for himself, Chief Judge Haynsworth, and Judge Butzner) distinguished *Donohoe* from most abstention cases:

> [D]efendants contend that * * * the doctrine of *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), requires that the district court abstain from exercising that jurisdiction. Fatal to defendants' argument, however, is the fact that there exist in the present case no potentially dispositive questions of state law. *See* 312 U.S. at 498–500, 61 S.Ct. 643. None of the parties has suggested that any interpretation of those Maryland statutes which purportedly authorized the actions of the County or the Commission would be dispositive of the litigation, nor was the district court asked to find a taking within the meaning of the Maryland state constitution. The only issue raised was one of federal due process. It is obvious that, where no issue of state law exists, the federal constitutional issue cannot be avoided by "a definitive ruling on the

9. *See* n. 10, *infra.*

state issue . . . ." 312 U.S. at 498, 61 S.Ct. 643. Hence, the *Pullman* doctrine is inapposite, and the district court's decision not to abstain was clearly the correct one. *See Ballard Fish & Oyster Co. v. Glaser Construction Co.,* 424 F.2d 473 (4th Cir. 1970).

567 F.2d at 607 (footnote omitted).

■ The case before this Court appears a better candidate for abstention than *Donohoe,* since interpretation of a complex yet seemingly coherent state scheme is involved. Yet that interpretation does not, as is discussed *infra,* appear to present difficult substantive problems. Accordingly, resolution herein at this time of the federal constitutional challenges is appropriate, if not required.[10]

## II. STATE DEFENDANTS

Plaintiffs' claims against the state defendants appear largely based on the alleged statutory responsibilities of those offi-

---

**10.** Nearly every decision in which abstention has been approved makes mention of the availability of an alternative state forum. *See, e. g., Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 501, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *Donohoe Constr. Co. v. Maryland-National Capital Park and Planning Comm'n,* 398 F.Supp. 21, 25 (D.Md.1975), *aff'd,* 567 F.2d 603 (4th Cir. 1977); *Fralin and Waldron, Inc. v. City of Martinsville,* 370 F.Supp. 185, 193 (W.D.Va.1973), *aff'd,* 493 F.2d 481 (4th Cir. 1974); *Santa Fe Improvement Co. v. City of Chula Vista,* 71 F.R.D. 573, 576 (S.D.Cal.1976).

At first glance, there appear to be two Maryland administrative forums in which plaintiffs can obtain review of defendants' alleged actions and omissions. One route would be by way of the County Board of Appeal. *See* Anne Arundel County Charter § 601 *et seq.;* Anne Arundel County Code 2–100 *et seq.;* 13–104.-3, .4, .7. It probably, however, would be futile for plaintiffs to appeal the County's refusal of a building permit for their subdivisions to the County Board of Appeal. While no subdivision has apparently been refused a building permit, such a refusal would seem most likely, in the face of the County Council's decision not to expand the Patuxent Wastewater plant and the prohibition in Md.Ann.Code art. 43, § 387C against the issuance of building permits when there is insufficient capacity.

Another potential route of review for plaintiffs would be to pursue a petition for a declaratory ruling by one or more of the involved state agencies under Md.Ann.Code art. 41, § 250. That section provides:

§ 250. Petition for declaratory rulings by agencies.

On petition of any interested person or corporation, any agency may issue a declaratory ruling *with respect to the applicability to any person, corporation, property or state of facts of any rule or statute enforceable by it.* A declaratory ruling, if issued after argument and stated to be binding, is binding between the agency and the petitioner on the state of facts alleged, unless it is altered or set aside by a court. Such a ruling is subject to review in the circuit court of the county or the Baltimore City Court, as the case may be, in

the manner hereinafter provided for the review of decisions in contested cases. Each agency shall prescribe by rule the form for such petitions and the procedure for their submission, consideration, and disposition. [Emphasis added].

That route likewise appears to offer little chance of success since interpretation by the concerned agencies of the relevant statutes is already known. Section 250 presents an avenue of hope when declaratory rulings are sought before an agency has actually made a decision to act or not, but hardly afterwards. *See, e. g., Public Citizen v. Commission on Medical Discipline,* 573 F.2d 863 (4th Cir. 1978).

There is the additional possibility that plaintiffs may be able to obtain a declaratory judgment in a state court regarding the duties under state law of the county or state defendants to provide wastewater treatment. *See* Md.Ann. Code Courts & Jud.Proc. § 3–401 *et seq.,* and in particular, § 3–406, which provides:

Any person interested under a deed, will, trust, land patent, written contract, or other writing constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, administrative rule or regulation, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, administrative rule or regulation, land patent, contract, or franchise and obtain a declaration of rights, status, or other legal relations under it.

*See Maryland-National Capital Park and Planning Comm'n v. City of Rockville,* 269 Md. 240, 305 A.2d 122 (1973) (suit brought to challenge statutory validity of municipality's rezoning of annexed land presented issue for determination by declaratory judgment); *Pressman v. D'Alesandro,* 211 Md. 50, 54, 125 A.2d 35 (1956). But even if plaintiffs can obtain a determination on the merits in a state court, they would appear to have a right, at this time, and in this Court, to have determined the federal issues they present. *See* Judge Winter's approach and holding in *Donohoe, supra,* at 607.

cials to require or to provide plaintiffs' properties access to sewerage treatment facilities. The state defendants are not involved in the provision of sewerage services in Anne Arundel County other than as directed by statute. Thus, a breach of their statutory duties or an unreasonable use of their statutory powers would appear to be a prerequisite to any finding of a constitutional violation by the state defendants.

### A. Neil Solomon, Secretary of Health and Mental Hygiene

Plaintiffs cite various sections of article 43 of the Maryland Annotated Code for the proposition that the Secretary of Health and Mental Hygiene had a duty to compel the expansion of the wastewater plant involved in this case. The Secretary does have the duty of

> assisting the counties and municipalities of the State in developing comprehensive master plans for the construction of the basic main facilities of sewerage systems for the collection and disposal of sewage and industrial wastes from lateral or collector sewers.

> \* \* \* \* \* \*

Md.Ann.Code art. 43, §§ 1H, 387A. Section 387C spells out the Department of Health's oversight of county plans for water supply, sewerage, and solid waste disposal systems in some detail.[11] The only provision of that section which arguably supports plaintiffs' claims is section 387C(c)(1)(v) which states that the Department shall adopt regulations which

> (v) *Require* the installation of community water supply, sewerage or solid waste disposal systems and the connection of all premises thereto or the service of all premises thereby *if such systems are reasonably necessary* giving due consideration to such factors as are set forth in paragraph 1(iv) of this subsection. Such systems shall be designed so as to permit connection to a larger system at such time as the larger system becomes available \* \* \*. [Emphasis added].

Paragraph 1(iv) of the subsection reads:

> (iv) Require consideration of the present and future density of population, size of the lots, contour of the land, porosity and absorbency of the soil, ground water conditions and variations therein from time to time and place to place, including availability of water from unpolluted acquifers or portions thereof, type of construction of community water supply and sewerage systems, size of the proposed development, and other pertinent factors \* \* \*.

Section 388 gives the Department general supervision of sanitary facilities:

> The [Department] shall have general supervision and control over the waters of the State, insofar as their sanitary and physical condition affect the public health or comfort; and it may make and enforce rules and regulations, and *order works to be executed*, to correct and prevent their pollution. It shall investigate all sources of water and ice supply, and all points of sewage discharge. It shall examine all existing public water supplies, sewerage system and refuse disposal plants, and *shall have power* to compel their operation in a manner which shall protect the public health and comfort, or *to order their alteration, extension or replacement by other structures when deemed necessary.* After April 16, 1914, it shall pass upon the design and construction of all public water supplies, sewerage systems and refuse disposal plants which shall be built within the State. [Emphasis added].

There is scant case law construing either section 387C or section 388. The only case discussing the construction of sewer facilities is Judge Northrop's opinion in *Smoke Rise, Inc. v. WSSC,* 400 F.Supp. 1369 (D.Md. 1975), discussed *infra* at pp. 1026–1027. In that case, Judge Northrop upheld an order of the Department of Health under section 388 placing a moratorium on additional sewer hookups in various areas of

---

11. Md.Ann.Code art. 43, § 387C (1977 Cum.Supp.).

Montgomery and Prince George's counties on the ground that it was a reasonable use of the police power. Restrictions imposed by local governments acting under the police power, Judge Northrop held, constitute a deprivation of property without due process only "where the police power is exercised in an arbitrary and unreasonable manner." Reasonableness was gauged in terms of (1) the "purpose" of the sewer moratoria and (2) their "duration." 400 F.Supp. at 1383.

▮ In this case, unlike *Smoke Rise*, there has been no order by the Secretary imposing a moratorium nor has there been any other action by his agency. Given the language "reasonably necessary" and "deemed necessary" in section 387C and section 388, the decision to require a com-

munity to expand sewerage facilities rests within the discretion of the Secretary. Thus, it appears that the Secretary's decision is final and subject to reversal only under the abuse-of-discretion standard of review. Assuming *arguendo* all of the agreed facts and those alleged by plaintiffs, it does not appear that the Secretary abused his discretion or acted unreasonably in not circumventing the County Council's decision not to expand the Patuxent plant.

▮ Plaintiffs also cite sections 391, 392 and 393 of article 43 for the authority of the Secretary to order construction or expansion of wastewater facilities. However, orders under any of those sections must be based on a finding of inefficient operation, potential nuisance, or hazard.[12] No facts

---

12. Those provisions read:

**§ 391. Order by State Board of Health when operation inefficient; action by Board when results not produced.**

When the State Board of Health finds, upon investigation, that any water supply or sewerage system, or refuse disposal works, on account of incompetent supervision or inefficient operation, *is not producing such results, from a sanitary standpoint, as might reasonably be expected, or is in any way a menace to health or comfort or is creating a nuisance,* it shall issue an order to the proper officer, board, department or person having charge of or owning such system or plant, to secure such operating results as might be reasonably expected, which results shall be, and shall be produced within such time as shall be satisfactory to the State Board of Health. If the desired results be not produced within the time specified, the State Board of Health may order the proper officer, board, department or person having charge of or owning such system or plant, to appoint, within such time as it may specify, and pay the salary of, a competent person, to be approved by the State Board of Health, who shall take charge of and operate such system or plant, so as to secure the results demanded by the Board.

**§ 392. Order for alterations or extensions when Board finds improvement cannot be made by change of manner of operation.**

When the State Board of Health finds, upon investigation, that any water supply or sewerage system, or refuse disposal works, is in any way *a menace to health or comfort, or is creating a nuisance, and conditions cannot be sufficiently improved,* in the opinion of the Board, by mere change in the method of operation, the State Board of Health shall be

empowered to issue an order requiring the owner of the system or plant to make such alterations or extensions to the system or plant, or to install such new system or plant, as the Board may determine necessary to correct improper conditions. The State Board of Health shall name in its order such date for the completion of the work as it may deem reasonable and proper.

**§ 393. Installation of system when Board finds conditions dangerous to health.**

When the State Board of Health finds, upon investigation, that any of the waters of the State are being, or are liable to become, *polluted in a way dangerous to health, or so as to be in any way a nuisance,* and such condition is due to the fact that there is no, or only a partial, system of public water supply, sewerage or refuse disposal in a certain county, municipality, district, subdivision or locality; or in case absence or incompleteness of a public system of water supply, sewerage or refuse disposal in any county, municipality, district, subdivision or locality is, in the opinion of the State Board of Health, *sufficiently prejudicial to the health or comfort of that or any other county, municipality, district, subdivision or locality;* then the State Board of Health may issue an order to the effect that a public system of water supply, sewerage or refuse disposal shall be installed and put into operation, or the existing system completed, in that county, municipality, district, subdivision or locality, within a specified time; or the Board may order the installation of such devices or the institution of such methods, and enforce such measures or regulations, as it may deem proper under the circumstances.

Md.Ann.Code art. 43, §§ 391–93 (emphases added). All powers of the State Board of

have been adduced or alleged by plaintiffs showing a nuisance or menace to health, or any danger of water pollution. There is no indication in the record that such conditions exist in either Odenton Town Center or in Anne Arundel County at large. Accordingly, the Secretary cannot be found to have abused his discretion by not making such findings himself and ordering the expansion of the Patuxent plant.

### B. Thomas D. McKewen, Director of the Maryland Environmental Service

The Environmental Service is responsible for the construction or expansion of wastewater plants to the extent set out in Md. Ann.Code *Natural Resources* § 3–105(d), (e), which read:

(d) To the extent appropriate in each instance, acquisition, design, construction, reconstruction, rehabilitation, improvement, operation, maintenance, and repair of water supply, wastewater purification and solid waste disposal projects, pursuant to an order of either the Secretary of Health and Mental Hygiene or the Secretary of Natural Resources as further provided in §§ 3–109 and 3–110 of this subtitle; or pursuant to a mandatory agreement to provide requested services, as provided in § 3–107 of this subtitle; or pursuant to an approved five-year plan, as provided in § 3–106 of this subtitle.

(e) Except upon request of the appropriate municipality and pursuant to a contract between the service and municipality, the service may not acquire, construct, operate, or establish a wastewater purification project or solid waste disposal project, as the case may be, for (1) any area or district which, in the determination of the Secretary of Health and Mental Hygiene, is receiving adequate service from a project owned by a municipality and operated in compliance with applica-

ble laws and regulations; or (2) any area or district which, in the determination of that Secretary, will receive, within a reasonable time, adequate service from a project owned by a municipality and operated in compliance with applicable laws and regulations.

As is evident, the Service cannot provide sewerage services unless one of three conditions occurs:

(1) The Service receives an order of either the Secretary of Health and Mental Hygiene as provided in § 3–110 directing it to provide such facilities or services; or

(2) The Service enters into an agreement as provided in § 3–107 with a person, corporation or political unit willing and able to pay for the costs of providing such facilities or services; or

(3) A five-year plan adopted as provided in § 3–106 confers upon the Service responsibility for providing such facilities or services.

■ The only one of those conditions possibly present in this case is the first relating to the power of the Secretary of Health and Mental Hygiene to order construction or expansion of such facilities.[13] However, under section 3–110, the Service's duty to construct such facilities is premised on an order of the Secretary of Health and Mental Hygiene under Md.Ann.Code art. 43, §§ 391, 392, 393, 397. As discussed *supra* at p. 1023, the Secretary must find a nuisance, a menace to health, or a threat of pollution to exist in order to issue an order under those sections. Since there is no indication in the record of such a situation, plaintiffs' claim against the Service is without merit.

### C. James B. Coulter, Secretary of Natural Resources

■ The Secretary of Natural Resources is sued as the chief official of the parent

---

Health conferred by those provisions are now exercised by the Secretary of Health and Mental Hygiene. Md.Ann.Code art. 43, § 1H.

**13.** Pursuant to § 3–105(d), it is arguable that the Service may have to construct or expand sewage treatment facilities pursuant to an order of the Secretary of Natural Resources. None of the provisions of § 3–105(d) specifical-

ly gives the Secretary of Natural Resources that power. Still, by statute, the Service is a unit of the state Department of Natural Resources. Thus, the exercise by the Service of all of its powers and functions are seemingly subject to the authority of the Secretary of Natural Resources. Md.Ann.Code *Natural Resources* §§ 3–103(a), 3–104(c).

agency of the Maryland Environmental Service. *See* Md.Ann.Code *Natural Resources* § 3–103(a). Since there appears to be no duty on the Service's part to construct the facilities sought in this suit, any claim against the Secretary of Natural Resources is likewise lacking in merit.

### D. Conclusion

The claims against the three state defendants resolve in essence into the question of whether the Secretary of Health and Mental Hygiene abused his discretion under art. 43, § 387A *et seq.* In this case, there is no basis for a holding that the Secretary's failure to require the County to expand the Patuxent plant or to arrange for the installation of wastewater facilities by the Maryland Environmental Service is either arbitrary or unreasonable. Thus, there is no basis in the record for finding either delinquency in the performance of defendants' delegated duties or a violation of plaintiffs' constitutional rights. Accordingly, judg-

ment will be entered against plaintiffs in favor of the state defendants.[14]

### III. ANNE ARUNDEL COUNTY

Plaintiffs seem to make four types of claims against the County for its failure to extend sewerage service to plaintiffs' properties: (a) taking of property without just compensation in violation of the Fifth and Fourteenth Amendments; (b) infringement of the right to travel of future generations; (c) unreasonable exercise of the police power so as to infringe plaintiffs' substantive due process rights; (d) breach of contract.

### A. Unconstitutional Taking

On December 16, 1976, this Court issued an oral opinion and a written Memorandum and Order in which it found no taking in this case. The Court has reviewed the subsequent submissions of the parties and reexamined a number of the relevant authorities.[15] After so doing, this

---

**14.** Given the resolution of the merits of plaintiffs' claims against the state defendants, the Court need not reach the somewhat more difficult question of whether the Eleventh Amendment bars those claims. The Eleventh Amendment provides that "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The amendment's prohibition applies also to suits against a state by its own citizens. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). However, under *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), plaintiffs can effectively obtain equitable relief against a state by suing a state officer. *Ex parte Young* was based on the theory that a state officer who acts unlawfully is no longer acting on behalf of the state, for purposes of the Eleventh Amendment. In *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Supreme Court held that equitable relief sought against a state official which would have more than "an ancillary effect on the state treasury" was not permissible under *Ex parte Young* and was barred by the Eleventh Amendment.

   In this case, plaintiffs originally sought damages from three state agencies. In their second amended complaint, plaintiffs dropped the damage claims and substituted the heads of the state agencies as defendants. Plaintiffs so did, apparently in order to avoid the bar of the Eleventh Amendment. The state defendants

under the second amended complaint maintain that design and construction of sewerage treatment facilities by the state agencies would entail a substantial expenditure out of the state treasury. They therefore argue that the Eleventh Amendment prevents this Court from granting such relief. However, even if the state defendants are correct in that regard, alternative forms of relief sought by the plaintiffs would appear to be available without the strictures of *Ex parte Young* and *Edelman.* A decree ordering the state officers to exercise whatever statutory authority they possess to compel the County to provide such facilities would probably not offend the Eleventh Amendment. That is because a suit seeking damages which will be satisfied out of a county treasury is generally not barred by the Eleventh Amendment. *See Edelman v. Jordan,* 415 U.S. 651, 667 n.12, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Lytle v. Commissioners of Election,* 541 F.2d 421, 426 (4th Cir. 1976); *Burt v. Board of Trustees,* 521 F.2d 1201, 1205 & nn. 4–5 (4th Cir. 1975).

**15.** *See Penn Central Transportation Co. v. New York City,* —— U.S. ——, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922); *Donohoe Constr. Co., Inc. v. Montgomery County Council,* 567 F.2d 603, 607–10 (4th Cir. 1977); *Steel Hill Development, Inc. v. Town of Sanbornton,* 469 F.2d 956, 963 (1st Cir. 1972); *Kent Island Joint Venture v. Smith,* 452

Court concludes that the County's failure to provide for plaintiffs more immediate access to a public sewerage treatment facility does not so substantially interfere with plaintiffs' use of their tracts as to deprive them of all or most of their interest in the property. *See Donohoe Constr. Co., Inc. v. Montgomery County Council, supra* at 608 n.13. Therefore, the Court's previous holding of December 16, 1976 is hereby reaffirmed.

### B. Right to Travel

■ Plaintiffs have invoked the right to travel of future potential inhabitants of Anne Arundel County at several places in their complaint. Plaintiffs' counsel have not, however, pressed that claim either in their submissions to the Court or in colloquy with this Court at the several hearings in this case. The merits of such a claim are, at the very least, doubtful. *See Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). In *Belle Terre* Mr. Justice Douglas, in upholding the ordinance under attack, noted: "It is not aimed at transients. *Cf. Shapiro v. Thompson* \* \* \*," *infra.* Neither are the challenged actions or lack of actions of any of the defendants in this case. It also is to be

noted that most successful assertions of the right to travel have involved attacks on durational residency requirements. *See, e. g., Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (voting); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (welfare benefits). In any event, the plaintiff land developers lack standing to raise the right to travel of third parties either of the present or of future generations. *See Construction Industry Ass'n v. City of Petaluma,* 522 F.2d 897, 903–05 (9th Cir. 1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976).

### C. Substantive Due Process [16]

■ As a general rule, in the absence of legislative direction, a municipality is the sole judge of the desirability of sewerage services.[17] The necessity, character, and extent of public improvements is usually committed to the discretion of municipal authorities. *See Kennedy-Chamberlin Devel. Co. v. Snure,* 212 Md. 369, 378, 129 A.2d 142 (1952); 11 E. McQuillin, Municipal Corporations § 31.17; 13 *id.* §§ 37.25–37.32. However, that general rule is limited by the due process clause: a county or municipal corporation must not exercise its police power in

---

F.Supp. 455, 460–61 (D.Md.1978); *Smoke Rise, Inc. v. WSSC,* 400 F.Supp. 1369, 1381–83 (D.Md.1975); *Picking v. Baltimore County,* Civil No. B–77–1715 (D.Md. May 31, 1978); *cf. State Department of Assessments and Taxation v. Clark,* 281 Md. 385, 410–11, 380 A.2d 28 (1977); *Norbeck Village Joint Venture v. Montgomery County Council,* 254 Md. 59, 68, 254 A.2d 700 (1969).

**16.** Plaintiffs also cite the equal protection clause of the Fourteenth Amendment in support of their claims. They argue that the County has unlawfully discriminated among landowners in the provision of sewer services. Since it appears that there is no fundamental right or suspect classification involved in this case, any such discrimination by the County would be subject only to the rational-basis type of scrutiny. That equal protection standard is essentially equivalent to the substantive due process reasonableness test. *See Construction Industry Ass'n v. City of Petaluma,* 522 F.2d 897, 906 n.11 (9th Cir. 1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976). *See also McLaughlin v. Florida,* 379 U.S. 184, 191, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). *Cf.*

*Rodgers v. Tolson,* No. 77–1454, 582 F.2d 315 at 319 (4th Cir. 1978).

**17.** Under Md.Ann.Code art. 25A, § 5(T), a county which has adopted a charter, as has Anne Arundel County, has been granted the power

> [t]o enact local laws enabling the county council to adopt from time to time, after reasonable notice and opportunity for public hearing and with or without modifications, ordinances and amendments thereof for the protection and promotion of public safety health, morals, comfort and welfare, relating to any of the following: the location, construction, repair, and use of streets and highways; the disposal of wastes; the control of problems of soil erosion and of the preservation of the natural topography in newly developed and other areas; and the erection, construction, repair and use of buildings and other structures; and to enact local laws providing appropriate administrative and judicial proceedings, remedies, and sanctions for the administration and enforcement of such ordinances and amendments.

an arbitrary, unreasonable, or capricious manner. Any exercise of that power must be substantially related to the public welfare. *See Moore v. East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion); *id.* at 513, 97 S.Ct. at 1943 (Stevens, J., concurring); *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Smoke Rise, Inc. v. WSSC*, 400 F.Supp. 1369, 1383 (D.Md.1975); 1 Antieau, Local Government Law § 5.18. *Cf. Walker v. North Carolina*, 262 F.Supp. 102, 105 (W.D.N.C.1966), *aff'd*, 372 F.2d 129 (4th Cir.), *cert. denied*, 388 U.S. 917, 87 S.Ct. 2134, 18 L.Ed.2d 1360 (1967) ("The ownership of property and all incidental rights thereto are subject to reasonable limitations which government authorities deem essential for the protection of the public health, safety, and welfare of the community.").

Plaintiffs allege that the combined actions of Anne Arundel County and the State of Maryland have resulted in an unreasonable *de facto* moratorium on growth in Anne Arundel County. That moratorium is allegedly due to the conjunction of a state statute and a county budgeting decision. The state statute forbids the issuance of building permits in localities in which sewage treatment facilities will be inadequate to service the new structures.[18] That statute appears reasonably related to the general welfare. Indeed, plaintiffs do not appear to attack the validity *per se* of that legislation. Rather, they assail the County's delay in attempting to expand the Patuxent plant which, in light of state environmental law, has hindered plaintiffs' ability to exploit the development potential of their landholdings.

The extent of that "moratorium" on growth will seemingly be circumscribed in both duration and geographical area. The County has informed the Court that funds have already been appropriated towards doubling the capacity of the Patuxent plant by approximately 1982. Although plaintiffs have indicated in a letter to this Court dated March 16, 1978 that they are not satisfied with the County's actions, it does appear that the County is making some effort to ensure adequate future sewerage treatment facilities for the Odenton Town Center area. As to the geographical extent of the alleged *de facto* moratorium, plaintiffs have not submitted any information relating to sewerage capacity in areas of Anne Arundel County other than the Odenton Town Center. It is also to be noted that the County Council appropriated over $20 million in the County's 1977–78 budget for wastewater treatment plants in other parts of the County. In addition, in its capital facilities program the County has programmed over $100 million over the next five years for wastewater treatment projects.

Plaintiffs have not presented or proffered any evidence of the County's alleged antigrowth policy with respect to properties other than their own. From the record before this Court, the County's various false starts and delays in expansion of the Patuxent plant might be better characterized as a *de facto* temporary rezoning of plaintiffs' properties rather than as a "moratorium" on growth. However, the case law suggests that the applicable legal standards are the same, no matter how the situation pertaining to plaintiffs' tracts is labeled.

In *Smoke Rise, Inc. v. WSSC*, 400 F.Supp. 1369 (D.Md.1975), plaintiff homebuilders challenged the validity of sewer hook-up moratoria promulgated by the Secretary of Health and Mental Hygiene for certain areas of Montgomery and Prince George's counties. In 1970 the Secretary had found that inadequate sewerage treatment facilities of the Washington Suburban Sanitation Commission (WSSC) constituted a nuisance and menace to the public health. Besides imposing the moratoria, the Secretary also ordered the WSSC to undertake certain remedial measures. Thereafter, the WSSC, Montgomery County, and the Department of Health and Mental Hygiene engaged in a complex series of transactions to alleviate the sewerage crisis, but apparently made little tangible progress over the following

---

18. Md.Ann.Code art. 43, § 387C(d)(3), set out at n.2, *supra*.

three years. 400 F.Supp. at 1373–77. Attacking the moratoria, the homebuilders asserted, *inter alia*, that the Secretary's orders deprived them of their property without due process of law.

Chief Judge Northrop examined the reasonableness of the moratoria orders in terms of their *purpose* and *duration*. As to purpose, he held that the avoidance of unsanitary conditions was clearly a proper purpose. However, he also examined the orders to determine whether, as alleged by plaintiffs in *Smoke Rise*, local officials had prolonged the moratoria in order to implement a tacit no-growth policy. On the basis of the record before him, Judge Northrop concluded that the comprehensive plans to improve wastewater facilities belied any hidden purpose to hinder growth. Judge Northrop wrote:

> In the instant case, as outlined in the statement of facts, *supra*, all of the various sewer moratoria orders have been accompanied by extensive and detailed plans of the steps which are being or will be taken to improve wastewater treatment capacity in Prince George's and Montgomery Counties. Interim as well as long-range plans have been adopted for most of the watershed basins. The Washington and Suburban Sanitary Commission, together with state and local officials, has actively pursued the implementation of these plans. Under these circumstances, it cannot be said that the moratorium on sewer service has been effected for the improper purpose of restricting from Prince George's and Montgomery Counties, Maryland's fair share of metropolitan Washington regional growth. Accordingly, this Court can find no deprivation of property without due process with regard to the purpose of the sewer moratorium.

400 F.Supp. at 1385.

As to duration, Judge Northrop held that "[w]hile a police power moratorium must be reasonably limited as to time, it is clear that the reasonableness of the duration of the moratorium must be measured by the scope of the problem which is being addressed."

*Id.* at 1386. Noting the planning requirements prerequisite to certain federal grants, the impoundment of water pollution funds by the Nixon administration in the early 1970's, and the complex inter-jurisdictional nature of the problem, he found the five-year moratorium reasonable in duration.

Cases concerning due process limits on the local zoning power provide another perspective on the problem presented in this case. In general, the courts will not interfere with the exercise of zoning power of a locality as long as the purpose of such exercise falls within the broad concept of the "public welfare." *See Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387, 47 S.Ct. 114, 71 L.Ed. 303 (1926). Even a zoning ordinance with exclusionary effects is valid if it serves a legitimate governmental interest, such as preservation of a town's rural environment or small town character. *Village of Belle Terre v. Boraas*, 416 U.S. 1, 9, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *see Construction Industry Ass'n v. City of Petaluma*, 522 F.2d 897, 905–09 (9th Cir. 1975), *cert. denied,*, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976). However, some state courts have held that a community may not utilize its zoning power to avoid its fair share of a region's population growth. *See, e. g., Southern Burlington County NAACP v. Mount Laurel*, 67 N.J. 151, 336 A.2d 713 (1975), *appeal dismissed and cert. denied*, 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975); *Appeal of Kit-Mar Builders, Inc.*, 439 Pa. 466, 268 A.2d 765 (1970); *National Land and Investment Co. v. Kohn*, 419 Pa. 504, 215 A.2d 597 (1965).

A property owner has no vested right in the continuance of the zoning status of his land unless he has proceeded with construction in reliance upon it. *See* 1A Antieau, Local Government Law § 7.164; *see also Montgomery County Council v. District Land Corp.*, 274 Md. 691, 337 A.2d 712 (1975); *Norbeck Village Joint Venture v. Montgomery County Council*, 254 Md. 59, 254 A.2d 700 (1969). In *Norbeck*, a lame duck County Council voted against preserving open space in a certain area of Mont-

gomery County. It thereby rejected a part of the County's Master Plan which it (the Council) had approved a few months earlier. Shortly thereafter, the succeeding County Council elected to follow the Master Plan and effectively reversed the action of its predecessor Council. Area land developers challenged the new Council's action on due process grounds. The Court of Appeals of Maryland held that "[a] property owner has no vested right to the continuance of the zoning status of his or neighboring property, merely the right to rely on the rule that a change will not be made unless it is required for the public good." 254 Md. at 66, 254 A.2d at 705. The Court concluded that the record supported a determination that the local roads, sewers, and other public services would not support intense development and "to install additional facilities that would be necessary to support a changed pattern would place a burden on the taxpayers that the County legislative body thinks is unwarranted and beyond its present capabilities." *Id.* at 68, 254 A.2d at 706. The Court held that there had been no taking and also that the new Council's action was not arbitrary, unreasonable, or otherwise illegal. *Cf. Montgomery County Council v. District Land Corp.,* 274 Md. 691, 706–07, 337 A.2d 712, 721 (1975) ("obtention of a building permit creates no vested right in an existing zoning classification unless substantial construction has been taken in reliance thereon").

The Court of Appeals of New York has twice dealt with cases somewhat similar to this one. In *Westwood Forest Estates, Inc. v. South Nyack,* 23 N.Y.2d 424, 297 N.Y. S.2d 129, 244 N.E.2d 700 (1969), a municipality amended a zoning ordinance to bar new construction of multiple dwellings in order to ease the burden on the local sewage disposal plant. A landowner, whose property was originally zoned for high-rise apartments, contested the rezoning of that property to a single family district. The Court of Appeals noted that the sewage problem did not involve access to the local plant, but rather inadequate treatment at that facility. Judge Breitel wrote:

A municipality has, of course, the power to take appropriate steps to deal with sanitation problems, including those created by inadequate biological treatment of sewage. The instant sanitation problem is, however, general to the community and not caused by the nature of plaintiff's land * * *. It is, therefore, impermissible to single out this plaintiff to bear a heavy financial burden because of a general condition in the community * * *. [Citations omitted].

The village relies upon criticisms of other government agencies concerned with pollution to justify its action. Notably, however, the Rockland County Health Department, although stating its reluctance "to put its blessing on adding additional amounts of sewage to an already poorly functioning system", stated that such approval might be obtained if there were a definite program of improvement for the sewer system and the new sewer connections were conditioned on the provision of financial contributions towards rebuilding the sewage disposal plant.

297 N.Y.S.2d at 132, 244 N.E.2d at 702. The Court also faulted the zoning amendment because it was not adopted "in furtherance of a comprehensive plan" and because it was not limited in duration. Finally, although the Court held the amendment invalid, it noted that alternative means of arresting the sewage crisis were available to the municipality:

This is not to say that the village may not, pursuant to its other and general police powers, impose other restrictions or conditions on the granting of a building permit to plaintiff, such as a general assessment for reconstruction of the sewage system, granting of building permits for the planned garden apartment complex in stages, or perhaps even a moratorium on the issuance of any building permits, reasonably limited as to time. But, whatever the right of a municipality to impose " 'a * * * temporary restraint of beneficial enjoyment * * * where the interference is necessary to promote the ultimate good either of the

municipality as a whole or of the immediate neighborhood'", such restraint must be kept "'within the limits of necessity'" and may not prevent permanently the reasonable use of private property for the only purposes to which it is practically adapted * * * [citations omitted].

*Id.* 297 N.Y.S.2d at 133, 244 N.E.2d at 702–03.

Subsequently, in *Belle Harbor Realty Corp. v. Kerr*, 35 N.Y.2d 507, 364 N.Y.S.2d 160, 323 N.E.2d 697 (1974), a developer sought a building application for construction of a four-story nursing home in New York City. A citizens group concerned about the inadequacy of existing sewerage facilities filed suit to prevent the issuance of the permit. After that suit was dismissed, the City granted the permit. However, it subsequently discovered that the local sewers were "grossly inadequate" and revoked the permit. The developer then brought an action to compel the City to reissue the permit. The Appellate Division of the Supreme Court of New York, citing *Westwood Forest*, held that the City could not punish a single landowner because of its own failure to construct adequate sewerage facilities. On appeal, the Court of Appeals of New York reversed the Appellate Division. It first distinguished *Belle Harbor* from *Westwood Forest*:

> We disagree with the Appellate Division majority and find that *Westwood Forest Estates (supra)* is not dispositive of the case at bar. In *Westwood* we held that a village could not utilize its zoning power to prohibit the new construction of multiple dwellings in order to avoid complying with State and county antipollution efforts. The situation before us is distinguishable in that it involves the general police power rather than the zoning power, and the sanitation problem is one of immediate direct impact rather than a generalized one. In contrast to the sewer system in *Westwood* which was operating at only 75% of capacity and was indisputably adequate, the system in Belle Harbor, is alleged to be "an already overloaded, overflowing, backing-up, antiquated sewer system."

364 N.Y.S.2d at 162, 323 N.E.2d at 699. Judge Wachtler stated that while a municipality is empowered to prevent conditions dangerous to the public health and welfare, any restrictions must be "within the limits of necessity." He wrote:

> Consequently a municipality may not invoke its police powers solely as a pretext to assuage strident community opposition. To justify interference with the beneficial enjoyment of property the municipality must establish that it has acted in response to a dire necessity, that its action is reasonably calculated to alleviate or prevent the crisis condition, and that it is presently taking steps to rectify the problem. When the general police power is invoked under such circumstances it must be considered an emergency measure and is circumscribed by the exigencies of that emergency.

*Id.* The Court of Appeals dismissed the case without prejudice to the commencement of a new proceeding to determine whether the revocation was necessary to prevent a dangerous condition.

In this case, the County's actions, to date, appear reasonably related to the public welfare in terms of geographical extent, duration and purpose. There is no suggestion that the County has stopped issuing building permits in areas other than Odenton Town Center. Additionally, it would appear that the County is about to appropriate funds to expand various facilities so that the present "moratorium" can be presently considered as limited in time. As in *Smoke Rise*, the County has developed a plan pursuant to Md.Ann.Code art. 43, § 387C for attacking the water and sewerage problems occasioned by its rapid growth. Plaintiffs have not attacked the validity of that plan. There is no evidence in the record that the County has been overly lax in implementing that plan though it would hardly seem to have acted as speedily as it might have.

To a large extent, given recent state environmental legislation, the issuance of building permits in areas such as

Odenton Town Center is beyond the County's control without the expenditure of large sums to upgrade simultaneously sewage treatment facilities in various parts of the County. If the County is attempting to meet its sewerage problems in good faith and with reasonable speed and efficiency, then the order in which it deals with affected areas appears to be a matter within the County's discretion, so long as there is no improper motive underlying its priorities [19] and a rational, non-arbitrary basis for the assignment of priorities. In a slightly different context, Judge Decker wrote:

> Municipalities must retain the authority to modify their policies with respect to community development, without having the burden of demonstrating that the consequences of change fall evenly upon interested parties. A contrary rule would prevent local government from reacting to changed conditions or from implementing alterations in municipal priorities. The unreasonableness of such a rule is apparent on its face.

*City of Highland Park v. Train*, 374 F.Supp. 758, 773 (N.D.Ill.1974), *aff'd*, 519 F.2d 681 (7th Cir. 1975), *cert. denied*, 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337 (1976). If the County fails to carry through in good faith and with reasonable speed and efficiency its announced purpose to provide increased capacity at the Patuxent plant or if the County indefinitely postpones that expansion with no interim or long-term blueprint to solve plaintiffs' dilemma as developers, plaintiffs will of course be free to commence a new action to enforce their federal constitutional rights. But at this juncture, the County is entitled to prevail on the record herein in the face of plaintiffs' substantive due process claims.

### D. Contractual Claims

Although not clearly stated in the complaint, plaintiffs appear to allege that the County is contractually obligated to provide sewer service to plaintiffs' planned developments. As far as this Court has been informed, there is no explicit written or oral agreement between the County and plaintiffs. What plaintiffs point to is the encouragement they say they received from certain County officials to pursue plaintiffs' venture. Plaintiffs also refer to certain correspondence prior to July 17, 1974 emanating from employees of the County and to affirmative responses therein to plaintiffs' inquiries about the future availability of sewer service. To support their theory of an implied contract in such circumstances, plaintiffs rely heavily on two cases: *Board of County Comm'rs v. MacPhail*, 214 Md. 192, 133 A.2d 96 (1957); *District Land Corp. v. WSSC*, 266 Md. 301, 292 A.2d 695 (1972). On analysis, both cases are quite different from the instant one.

In *MacPhail*, the plaintiff in 1941 told the County Commissioners that he would substantially improve his property and convert his "simple cattle farm" into a horse and cattle breeding operation if the Commissioners would pave the road to his land. MacPhail deeded to the County land for the road and, at the request of the Commissioners, also obtained an option from the owner of abutting property. MacPhail also carried out his promise to improve his own property. Between 1942 and 1951, the County worked on MacPhail's road in fits and starts, making little progress. Finally, MacPhail threatened legal action and in 1954 his attorney presented the Commissioners with papers to be filed in a prospective suit. After a meeting between the attorney and the Commissioners, MacPhail agreed not to file suit and the Commissioners agreed to pave the road in 1954 and 1955. When the County subsequently failed to pave the road, MacPhail filed a suit. The Court of Appeals of Maryland affirmed the Chancellor's holding that Mac-

---

**19.** *See Hawkins v. Town of Shaw*, 437 F.2d 1286 (5th Cir. 1971), *on rehearing*, 461 F.2d 1171 (5th Cir. 1972) (en banc) (discriminatory provision of municipal services based on race); *Kennedy Park Homes Ass'n v. City of Lackawanna*, 318 F.Supp. 669 (W.D.N.Y.), *aff'd*, 436 F.2d 108 (2d Cir.), *cert. denied*, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1970) (racial discrimination in rezoning and establishing sewer moratorium in area planned for low-income housing).

Phail's forbearance to sue in 1954 was good consideration for the promise of the Commissioners to pave the road to his farm. Holding that the Commissioners had legal authority to make such an agreement, the Court affirmed the Chancellor's order directing specific performance. The Court did not reach, and did not need to reach, the question of whether the earlier interactions between MacPhail and the County amounted to an enforcible contract. The actual holding in *MacPhail* has little relevance to this case. It is also to be noted that in *MacPhail* there were explicit mutual promises. The landowner fulfilled his promise to improve the land; the County reaped the benefit without carrying out its own promise. That sort of unjust enrichment has not occurred in this case in which plaintiffs' development is contingent on the County's ability to issue building permits. Also, in this case, an intervening amendment of a state law has substantially altered the County's ability to carry out the intentions expressed in earlier representations to the plaintiffs. No such factor accounted for the extensive delays in *MacPhail*.

In *District Land Corp. v. WSSC*, 266 Md. 301, 292 A.2d 695 (1972), a developer purchased property in Montgomery County for construction of an apartment complex. It entered into a "Front-Foot Benefit Agreement" with the WSSC under which the WSSC constructed sewer and water extensions in exchange for certain fees. Subsequently, the Montgomery County Council, under the authority of a state statute, passed a resolution directing that sewer service would only be provided by the WSSC to developments which conformed to the County's master plan. While the developer's project in *District Land* did not so conform, the developer did comply with all of the conditions in its agreement with the WSSC and also obtained building permits from the County. The WSSC refused to issue water and sewer permits, citing the County Council's resolution. The developer filed suit challenging that action. The Court of Appeals of Maryland held that, as a matter of statutory construction, the County Council had power to regulate through its master plan *future* extensions and improvements of sewer service. However, the Court held that the statute did not delegate to the Council such power with respect to improvements already in place. Construing the County Council's resolution in that light, the Court held that the WSSC interpretation of the resolution was incorrect and ordered that the sewer connections be granted.

The situation in *District Land* is quite different from the record in this case. In *District Land*, there was an explicit written agreement between the developer and the public utility. The Court enforced that agreement only after determining that it was not abrogated by intervening legislation. In this case there was no clear *commitment* at any time by the County to provide service. Additionally, the statute which prohibits the issuance of building permits here is unambiguous.

In sum, plaintiffs' claims respecting a contractual commitment by the County do not entitle plaintiffs to relief herein, any more than do plaintiffs' other contentions. Accordingly, judgment will be entered in this case in favor of all defendants.